## COMMONWEALTH OF PENNSYLVANIA *v.* STATE OF WEST VIRGINIA.

## STATE OF OHIO *v.* STATE OF WEST VIRGINIA.

### IN EQUITY.

Nos. 15 and 16, Original. Argued December 8, 9, 1921; restored to
docket for reargument January 9, 1922; reargued February 28,
March 1, 1922; restored to docket for reargument November 13,
1922; reargued April 20, 1923.—Decided June 11, 1923.

1. A justiciable controversy between States, in the sense of the Ju-
diciary Article, is presented when the plaintiff State, relying on
the Commerce Clause of the Constitution, seeks to enjoin the
defendant State from consummating a purpose, evinced by her
statutory enactment, and about to be carried out by her officials,
of withdrawing natural gas from an established current of com-
merce moving from her territory into that of the plaintiff, when
such withdrawal is likely to be productive of great injury to the
interests of the plaintiff as the proprietor of public institutions
and schools in which the gas is largely used, and to private con-
sumers, including most of the inhabitants of many urban com-
munities and a substantial part of the population of the plaintiff
State, whose health, comfort and welfare are seriously jeopardized
by the threatened withdrawal of the gas from the interstate
stream. P. 591.
2. Suits by Pennsylvania and Ohio to enjoin West Virginia from
enforcing an act of her legislature (c. 71, Acts 1919,) intended,
through regulation of pipe line companies, to compel the retention

within West Virginia of all natural gas there produced, that might be required for local needs, were not premature in not awaiting an actual test of the act or an order of the public service commission vested by it with functions for its enforcement, since the act contains procedural, penal and remedial provisions adequate to accomplish its purpose, and the situation when the suits were brought was such that, directly and immediately, it would work a large curtailment of the volume of gas moving into the complaining States and, in a few years, with increasing demand and decreasing production, would work a practical cessation of the interstate stream which it was the object of the suits to protect. P. 592.

3. In such suits, neither the pipe line companies transporting and supplying the gas, nor consumers in the defendant State who would be benefited by an enforcement of the act, were essential parties. P. 595.

4. A State wherein natural gas is produced and is a recognized subject of commercial dealings may not require of those producing and transporting it that, in its sale and disposal, consumers in that State shall be accorded a preferred right of purchase over consumers in other States, when the requirement necessarily will operate to withdraw a large volume of the gas from an established interstate current whereby it is supplied in other States, to consumers there. P. 595.

5. The purpose of the Commerce Clause is to protect commercial intercourse from invidious restraints, to prevent interference through conflicting or hostile state laws, and to insure uniformity of regulation. It means, that, in the matter of interstate commerce, we are a single Nation—one and the same people. P. 596.

6. The transmission of natural gas from one State to another, for sale and consumption in the latter, is interstate commerce, and a state law, whether of the State where the gas is produced or of that where it is to be sold, which by its necessary operation prevents, obstructs or burdens such transmission, is a regulation of interstate commerce—a prohibited interference. P. 596.

7. The power of a State to require gas pipe-line companies to furnish reasonably adequate service within reasonable territorial limits, will not enable her to enforce preference to local consumption at the expense of interstate business which has grown up with her sanction and encouragement. P. 597.

8. Interference with interstate commerce in natural gas cannot be justified upon the ground that it is a measure designed to conserve the gas, as a natural product of the State in the interest of her

people, because the gas has become a necessity and the supply is no longer sufficient to satisfy local needs and be used abroad. P. 598. *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229.

9. The Court, on full consideration, having reached the conclusion that the West Virginia Act is unconstitutional, and that its intended enforcement will subject the complaining States to injury of serious magnitude, operating with obvious inequity against them,— the appropriate decree is one declaring the act invalid, and enjoining its enforcement, leaving any needed regulation of the interstate commerce involved to be sought elsewhere. P. 600.

Decrees for complainants.

THESE were two suits, brought originally in this Court, to enjoin the defendant State from enforcing an enactment of her legislature (c. 71, Acts 1919,) upon the ground that it would curtail or cut off the supply of natural gas produced within her territory and carried by pipe lines into the territory of the plaintiff States, and there sold and used for fuel and lighting purposes. The act, and the facts constituting the situation to which it applied, are fully analyzed in the opinion.[1]

*Mr. John W. Davis* and *Mr. George E. Alter,* Attorney General of the Commonwealth of Pennsylvania, with whom *Mr. John G. Price,* Attorney General of the State of Ohio, *Mr. A. Leo Weil, Mr. E. E. Corn, Mr. Freeman T. Eagleson* and *Mr. R. G. Altizer* were on the briefs, for plaintiffs.[2]

---

[1] After the first argument, the Court, on January 9, 1922, ordered the cases restored to the docket for reargument with special reference to the questions whether the suit was not prematurely brought and whether the bill presents a cause justiciable between the two States parties to the action. See 257 U. S. 620. After reargument, the cases were again, on November 13, 1922, restored to the docket for reargument before a full bench.

[2] At the first hearing, the case was argued by *Messrs. Alter* and *Weil* on behalf of the Commonwealth of Pennsylvania, and by *Messrs. Price* and *Eagleson* on behalf of the State of Ohio. At the second hearing, the case was argued by *Mr. Davis* on behalf of both States and by *Mr. Alter* on behalf of Pennsylvania.

The Act of West Virginia is an unconstitutional interference with established courses of interstate commerce.

The course of the gas from the well to the ultimate consumers in Pennsylvania and Ohio is determined by existing contract relations, public service duties in other States, long-established courses of business and the physical structures adapted thereto. The gas that goes into other States is actually in interstate commerce from the time it leaves the wells until it reaches the ultimate consumers. *United Fuel Gas Co.* v. *Hallanan,* 78 W. Va. 396; 257 U. S. 277; *Pennsylvania Gas Co.* v. *Public Service Comm.,* 252 U. S. 23.

The whole design of the West Virginia statute is to divert or retain for the benefit of West Virginia consumers natural gas that in the absence of the statute would go to consumers in the other States through these established channels of interstate commerce. This intention is made manifest:

(*a*) By the consideration of the extent and character of the industry to which it applies, from which it appears that the full supply of gas that the statute requires to be furnished can be furnished only at the expense of consumers in other States. (*b*) By the history of the efforts of other States and of West Virginia to secure for themselves the exclusive or preferential enjoyment of their natural products, of which the present act is the logical development. *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229, and cases there cited; *United Fuel Gas Co.* v. *Hallanan, supra.* (*c*) By the very terms of the act, which in effect if not in words, require that all gas produced in West Virginia shall be supplied to West Virginia consumers so far as they want it for any purpose, domestic, industrial, or other. (*d*) By the admissions in the answers, which in effect state that the purpose of the act is to supply fully the requirements of West Virginia consumers out of the abundance of gas produced in the State now going to supply consumers in other States.

The statute, to the extent that it requires natural gas that otherwise would go to other States to be diverted or retained for the use of West Virginia consumers, is equivalent to a prohibition upon the transmission of such gas to such other States and is void as a discrimination against interstate commerce. *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229, and cases there cited; *Ward* v. *Maryland,* 12 Wall. 418; *Woodruff* v. *Parham,* 8 Wall. 123; *Welton* v. *Missouri,* 91 U. S. 275; *Guy* v. *Baltimore,* 100 U. S. 434; *Walling* v. *Michigan,* 116 U. S. 446; *Minnesota* v. *Barber* 136 U. S. 313; *Brimmer* v. *Rebman,* 138 U. S. 78.

It may be conceded that state regulations that have to do primarily with matters of local concern, calling imperatively for regulation, and that do not discriminate against or burden interstate commerce, are unobjectionable. *Pennslyvania Gas Co.* v. *Public Service Commission,* 252 U. S. 23. It is an open question, not involved in this case, whether West Virginia, in the absence of congressional action, could prescribe regulations more directly affecting interstate commerce and designed to secure equality among consumers and the most advantageous use of the gas produced in her borders irrespective of state lines, for example, regulations designed to secure a preference for domestic consumers everywhere over industrial consumers. There is no discrimination in favor of consumers in Pennsylvania and Ohio and the act under consideration is not designed to prevent such discrimination. Its intention and necessary effect are to produce discrimination in favor of West Virginia.

The theory that there was an antecedent duty resting on the natural gas companies in West Virginia to supply fully the requirements of their West Virginia consumers before supplying gas for the use of consumers in other States does not rest on any special provisions contained in their charters, or on any contract obligations

into which they have entered. The preëxisting obligation, if any, must be inferred from the fact that the companies in question had the power of eminent domain under the West Virginia law and were engaged in the business of supplying gas to the public in West Virginia.

The obligations of the companies in West Virginia to supply gas for the use of consumers in Pennsylvania and Ohio were assumed before there was any question of the sufficiency of their supplies of gas both to meet fully the requirements of their West Virginia consumers and to meet fully the obligations assumed by them to furnish gas to or for the use of consumers in other States. If the order in time of the assumption of obligations were a matter of importance, the fact is that in large measure the obligations to furnish gas for use in other States antedated the obligations assumed to furnish gas in West Virginia. But it is believed that the order in time is of no consequence. The public service duties in West Virginia and elsewhere and the contract obligations were rightfully undertaken and were on a parity. When, by reason of subsequent events, the supply of gas has become insufficient to meet fully the wants of West Virginia consumers and the commitments for the supply of consumers in other States, the burden of the shortage must be borne on an equitable basis that recognizes this parity of obligation.

The fact that the companies in West Virginia were organized under the laws of that State, or were permitted to do business there and were given the power of eminent domain or were denominated common carriers, does not invalidate contracts made by them to deliver gas in interstate commerce or import into their interstate contracts and commitments a condition that they shall be subject to a prior obligation on the part of the West Virginia companies to supply fully the requirements of West Virginia consumers. A railroad organized under the laws

of a State and engaging in interstate commerce is not under an implied duty to devote its facilities to meeting fully the requirements of intrastate traffic in case they are insufficient to fully meet both intrastate and interstate requirements. Neither a public service corporation nor other corporation should assume obligations that it is unable to perform. But the situation here does not concern the propriety of a public service corporation's extending its service or entering into contracts and commitments that will interfere with its due performance of the public service duties to which it is already subject, but has to do with a system that already exists and has existed for many years and has supplied adequate service in all the States alike.

The act cannot be sustained on the ground that it is the exercise by West Virginia of a right to impose new duties on corporations of her creation or which she permits to do business within the State, or on any similar ground.

The question whether West Virginia might originally have imposed upon corporations of her creation or upon corporations which she permitted to do business within the State the condition that they should supply fully the requirements of West Virginia consumers before taking any gas out of the State is not involved. On principle the validity of such a statute may well be doubted. There is here, however, an existing system of interstate contracts, an established course and flow of interstate commerce, and West Virginia cannot under the guise of imposing new duties on corporations of her creation or new conditions on foreign corporations doing business within the State work a discrimination against or impose burdens upon this interstate commerce. *Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1.

The statute in fact applies to individuals and partnerships as well as to corporations; it applies not only to

those who are engaged in the business of furnishing gas to the public, but to all those who are furnishing or are required by the common law or by statute to furnish gas for the use of the public or any part of the public; it requires every person or corporation who is furnishing gas in any place to furnish it in every place that can be reached directly or indirectly by the lines of such person or corporation, and every person, firm or corporation who is furnishing gas for special purposes to furnish it for all purposes. It fastens not merely upon part but upon all the gas produced by any of the persons named, " to the extent of his supply produced in this state." It gives to the West Virginia consumer a preferential right which in times of scarcity must surely blossom into absolute monopoly. It can be sustained only on the theory that the right of all the persons and corporations to whom it applies to engage in interstate commerce in natural gas and all contracts entered into by them in furtherance of such commerce are subject to the prior performance by such persons and corporations of every obligation in favor of West Virginia consumers that the legislature of West Virginia may see fit at any time to impose. But such a theory substantially claims for West Virginia the right to refuse to allow her natural gas to be taken out of the State, which was the very right denied to Oklahoma in *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229.

There is no time after the gas comes into the possession of the companies in West Virginia when it is not in interstate commerce. When it first comes out of the ground or is first purchased from the local producer it comes into the possession of the public utility company, dedicated, so far as concerns the proportion thereof necessary to fulfill interstate contracts and obligations, to interstate commerce. The proportion that has an interstate destination is fixed from the first moment by existing contracts and relations. *United Fuel Gas Co.* v. *Hallanan,* 87 W. Va. 396; 257 U. S. 277.

But it may be said that the obligation of the statute goes back of the production or purchase by the West Virginia utility company, so that the gas first comes into existence as a possible subject of interstate commerce already charged with the obligation created by the statute. The answer to this suggestion is that the commerce clause is not confined in its operation to commodities in transit in interstate commerce. It renders void legislation that would forbid the putting of property into interstate commerce or the acquisition of property for delivery in fulfillment of interstate commerce contracts just as effectively as it renders void legislation interfering with the transportation of goods after they are in interstate commerce. The State may put many restrictions upon the production of gas, or on the manufacture of beer or on any other subjects of production and manufacture; it may in the exercise of its police powers prohibit altogether the manufacture of things deemed noxious and any resulting effect on interstate commerce is indirect and incidental; but if the State permits the production, or creation, or acquisition of a subject of commerce, it cannot limit such subject of commerce to intrastate commerce. It can no more by discriminatory legislation forbid the creation of a subject of interstate commerce than it can forbid its transportation. *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *Geer* v. *Connecticut,* 161 U. S. 519.

The bill of complaint in each case presents a cause justiciable between the two States parties to the action.

Pennsylvania and Ohio sue to protect themselves and their citizens in the enjoyment of the natural gas service that has grown up under the free flow of interstate commerce against interference with that service by the wrongful act of West Virginia. The right they assert is their right and the rights of their citizens to receive natural gas that would come to them in the ordinary course of

interstate commerce following its accustomed channels and unimpeded by any illegal obstruction. They do not set up any title by contract or grant in the gas produced in West Virginia but each State rests its cause on the fact that there has grown up and is established a definite course of interstate commerce through the pipe line companies of West Virginia and the distributing systems in the plaintiff State, on which its institutions and inhabitants are dependent for their supply of fuel and which course of interstate commerce is threatened by the act of West Virginia. In a broad sense, the unlawful obstruction of interstate commerce threatened by West Virginia would constitute a nuisance, which each State has the right to have enjoined. The cause presents all the elements necessary to sustain an ordinary cause of action between individuals, to wit, a wrongful and unlawful act and special injury. The relation of cause and effect between the act threatened by West Virginia and the injury to the plaintiff States and their citizens would be immediate, whether the gas passes from its source in West Virginia to the consumers in the plaintiff States through the lines of a single company, or successively through the lines of several companies, and whatever the arrangements may be between the successive companies through whose lines it may pass. It is sufficient that the course of the gas from its source in West Virginia to the consumers in the plaintiff States is so fixed by existing facilities, business arrangements, contracts and custom as to establish the relation of cause and effect between the threatened interference on the part of West Virginia and the apprehended injury to the plaintiff States and their citizens.

The cause falls within the class of controversies justiciable between States.

The decisions indicate that the jurisdiction embraces every controversy between States determinable by any

existing or discoverable rule which may be deemed to fix their relative rights; in other words, every controversy which if it arose between independent States might be determined by arbitration and even controversies which as between independent States would not be justiciable because involving questions of independence or sovereignty or other matters of vital interest. Indeed, it would seem that the jurisdiction must include every controversy growing out of a grievance of one State against another, for a State asserting a grievance must base it upon the violation of some existing or assumed principle fixing their relative rights. If the principle exists and the violation is proved a cause of action is made out; while if the principle does not exist, judgment must go against the complaining State upon the merits. *Cohens* v. *Virginia,* 6 Wheat. 264; *Rhode Island* v. *Massachusetts,* 12 Pet. 657; *Kansas* v. *Colorado,* 206 U. S. 46.

But whatever limits there may be upon the jurisdiction of the Supreme Court in controversies between States to which no existing rule of international or municipal law is applicable, the decided cases appear clearly to establish that every controversy between States is justiciable when (1) it involves a claim which if it arose between independent sovereignties might properly be prosecuted by diplomatic representation, reprisal or war, and (2) which is determinable by existing rules of international or municipal law. *Missouri* v. *Illinois,* 180 U. S. 208; 200 U. S. 496; *Kansas* v. *Colorado,* 185 U. S. 125; 206 U. S. 46; *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230; 237 U. S. 474; *New York* v. *New Jersey,* 256 U. S. 296.

The controversies between Pennsylvania and West Virginia and between Ohio and West Virginia are clearly justiciable within the principles so established. In each case there is a controversy between two States, involving a grievance asserted by one against the other. The asserted grievance is that the State complained against is

threatening to do something that is forbidden by the Constitution governing the relations between the States and which will cause injury to the complaining State and its citizens. The Constitution itself and a long line of decisions interpreting the meaning of the Commerce Clause furnish the rules of law for the determination of the controversy.

To the suggestion that the suit cannot be maintained because it is brought to redress the grievance of individual citizens there are two answers: (1) Each of the plaintiff States sues as well in its own behalf in the capacity of owner and proprietor of its institutions, etc., and guardian of their inmates as in the capacity of representative or *parens patriæ* of its citizens. (2) In suing in a representative capacity the States do not represent individual citizens but the consuming public served by the public utilities companies that derive their gas from West Virginia.

While a State may not sue in this Court to promote purely private interests, it may properly sue to protect the health and comfort of its inhabitants and the value of their property, though in its sovereign capacity or in its capacity as proprietor it has no interest in the controversy, and though the danger it seeks to avert does not threaten all of its inhabitants, or does not threaten all of them in like degree. *Missouri* v. *Illinois,* 180 U. S. 208; 200 U. S. 496; *Kansas* v. *Colorado,* 185 U. S. 125; 206 U. S. 46; *New York* v. *New Jersey,* 256 U. S. 296. The line between the cases in which a State may bring suit as representative of its citizens and the cases in which it will be regarded as not a real party to the controversy is not hard to find. A State may not use its power of eminent domain or its taxing power for the benefit of an individual or for the benefit of defined individuals, however numerous. It may, however, use its power of eminent domain and its taxing power for the benefit of the public. But

the public does not mean necessarily all the people. So a State may maintain a suit for the benefit of the public though the public immediately concerned is less than all. The same principles that determine in other fields of action what are public and what are private purposes will serve to determine the cases in which a State may sue as representative of its citizens. Pennsylvania and Ohio sue for the benefit of all their citizens who are or may be dependent on the public service companies obtaining their supplies of natural gas from West Virginia. These citizens constitute the same public in whose behalf these States authorize their public service companies to exercise the power of eminent domain, and in whose behalf they assume the right to regulate the rates and service of the public service companies. This great class, including a great proportion of the population of each State, must be regarded not as the mere sum of the individuals of which it is at any given time composed, but as a part or factor of the community itself.

It is too late to question the right of a State to maintain a suit in this Court based on the Commerce Clause of the Constitution to protect its own proprietary rights. *Pennsylvania* v. *Wheeling and Belmont Bridge Co.,* 9 How. 647; 11 How. 528; 13 How. 518; 18 How. 421.

The Commerce Clause establishes, in the absence of congressional action to the contrary, the right to free trade between the States. It is a right which is the subject no less of judicial than of legislative protection. Whenever it is interfered with by state action, those injured, whether individuals or a State in its proprietary capacity, are entitled to resort to the courts for relief. In addition a State may sue as the representative of her citizens when there is special injury done or threatened to the special public whose interest and welfare it is the function of the State to safeguard.

The law of West Virginia is wrongful; through its effect upon an established and definite course of interstate

commerce it reaches into the territory of the plaintiff States, and there does injury to the plaintiff States and their citizens. The liability of West Virginia to suit rests upon the same principle declared in *Kansas* v. *Colorado,* 206 U. S. 46, 97, 98.

*Rhode Island* v. *Massachusetts,* 12 Pet. 657, determined for all time that controversies between States are not excluded from the cognizance of this Court because they involve questions that are political in their nature, and *Missouri* v. *Illinois,* 180 U. S. 208; 200 U. S. 496; *Kansas* v. *Colorado,* 185 U. S. 125; 206 U. S. 46, and *New York* v. *New Jersey,* 256 U. S. 296, are illustrations of the fact that a State is not immune from suit on account of the extra-territorial effect of its own laws, because such laws also immediately affect persons or property within its own jurisdiction, and have a final object which if sought to be attained by lawful means would be a proper aim for state legislation.

These suits are not prematurely brought.

*Mr. George M. Hoffheimer,* with whom *Mr. Edward T. England,* Attorney General of the State of West Virginia, *Mr. Fred O. Blue, Mr. Philip P. Steptoe* and *Mr. William S. John* were on the briefs, for defendant.[3]

In neither case does the bill present a cause justiciable between the two States.

Whether a suit is against a State, in the constitutional sense, is a matter of substance and effect, not to be determined by the names of the parties.

Conceding that no hard and fast line has yet been drawn delimiting the justiciable and the non-justiciable between States, *Missouri* v. *Illinois,* 180 U. S. 208, 241, we think that a brief survey of the cases and the mode of

---

[3] At the first hearing the case was argued on behalf of the State of West Virginia by *Messrs. Hoffheimer, Blue* and *Steptoe.* At the second hearing it was argued by *Messrs. Blue* and *Hoffheimer.*

their disposition, *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S. 265, 287, 297, readily marks the present litigation as falling within the latter category.  It is not the " subject of judicial cognizance," *Hans* v. *Louisiana,* 134 U. S. 1, 15; *Louisiana* v. *Texas,* 176 U. S. 1, 15; *Missouri* v. *Illinois,* 180 U. S. 208, 233, or " susceptible of judicial solution." *Louisiana* v. *Texas,* 176 U. S. 1, 18, 22; *Missouri* v. *Illinois,* 180 U. S. 208, 233, 234.

Of the cases of which this Court has taken original jurisdiction the most numerous have been those relating to the boundaries or territorial integrity.

In another class of cases jurisdiction was exercised because of a nuisance by the invasion of the plaintiff States by sewerage or disease germs polluting their waters and soil, to the injury, actual or threatened, of the lives, health and property of the citizens of those States.  Examples are *Missouri* v. *Illinois,* 180 U. S. 208; 200 U. S. 496; and *New York* v. *New Jersey,* 256 U. S. 296.  Falling within the same category is *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230.

These nuisance cases are identical in principle with the boundary cases.  The sovereign rights and territorial integrity of a State may be as effectually invaded or infringed by the casting or precipitation thereon of intangible, but nevertheless noxious, bacteria or gases as by visible seizure of its lands.  *Kansas* v. *Colorado,* 185 U. S. 125; 206 U. S. 46, was similar in aspect.  In *Pennsylvania* v. *Wheeling and Belmont Bridge Co.,* 13 How. 518, the suit was treated " as brought to protect the property of the State."

Another class of cases has been those of contract,—of indebtedness from one State to another, or to the creditors of the latter, from the debts to whom the plaintiff was entitled to exoneration at the hands of the defendant. *South Dakota* v. *North Carolina,* 192 U.S. 286; *Virginia* v. *West Virginia,* 206 U. S. 290; 220 U. S. 1; 238 U. S. 202;

*United States* v. *North Carolina,* 136 U. S. 211; *United States* v. *Michigan,* 190 U. S. 379. Comparison of *South Dakota* v. *North Carolina,* and *Virginia* v. *West Virginia,* with *New Hampshire* v. *Louisiana,* 108 U. S. 76, indicates that jurisdiction in the former cases was predicated upon the property rights in the plaintiff States or the protection of their corporate credit.

But we have found no instance in which this Court has entertained original jurisdiction predicated solely upon the right of the plaintiff State as *parens patriae,* or as the representative of its citizens, to enforce their private grievances or to protect their private claims arising out of the enforcement of the law of another State, in the absence of a special or additional right of the character above indicated in the plaintiff State itself. Vide, *New Hampshire* v. *Louisiana,* 108 U. S. 76; *New York* v. *Louisiana,* 108 U. S. 76; *Louisiana* v. *Texas,* 176 U. S. 1; *Oklahoma* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 220 U. S. 277; *Oklahoma* v. *Gulf, Colorado & Santa Fe Ry. Co.,* 220 U. S. 290. And see: *North Dakota* v. *Chicago & N. W. Ry. Co.,* 257 U. S. 485; *Pennsylvania* v. *Wheeling Bridge Co.,* 13 How. 518, 559; *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 20.

From the foregoing it is evident that a suit by one State against another cannot be predicated upon the mere relation of *parens patriae;* that something more than a willingness or desire to vindicate the supposed rights of the plaintiff's citizens is requisite; and that the multiplicity or unanimity of complaints by the citizens of the one State against the acts of the other cannot, by a process of aggregation or combination, be erected into a controversy between States or present a cause justiciable between such States.

It follows that no justiciable cause arises by reason of the alleged threatened deprivation or shortage of gas supply to the inhabitants of the plaintiff States. And

much the more is this true in respect of the alleged infringement of constitutional guaranties of companies engaged in gas transportation, or of citizens of the plaintiff States alleged to have made investments in West Virginia, " since it is a well settled rule of this Court that it only hears objections to the constitutionality of a law from those who are affected by its alleged unconstitutionality in the features complained of." " The plaintiffs must show that their own rights are infringed." *Jeffrey Mfg. Co.* v. *Blagg,* 235 U. S. 571; *New York Central R. R. Co.* v. *White,* 243 U. S. 188; *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531; *Arkadelphia Co.* v. *St. Louis S. W. Ry. Co.,* 249 U. S. 134; *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282.

If original jurisdiction is attempted to be sustained because of the supply of West Virginia gas to municipalities or public institutions in Ohio and Pennsylvania, the jurisdiction is equally negatived by the above cited cases. *Louisiana* v. *Texas,* 176 U. S. 1, 18; *Missouri* v. *Illinois,* 180 U. S. 208, 249; *Kansas* v. *Colorado,* 185 U. S. 125, 145.

The alleged right to West Virginia gas claimed by the plaintiffs for themselves and their inhabitants, if such right exists, is a right, not against the State of West Virginia, but against the gas companies to whom the plaintiffs and their inhabitants look for their gas supply. If the right exists against the West Virginia public service gas companies by whom the gas is furnished, either directly or remotely, it is mainfest that the right can rise no higher than that of the companies themselves. As against the State of West Virginia the claim in substance is, not that West Virginia has directed its action against the plaintiffs, but that by the exercise of governmental power against the public service companies within the boundaries of West Virginia, the plaintiffs are, or may be, affected consequentially.

Whether the West Virginia companies shall furnish gas to or for the plaintiffs, is at most a matter of controversy between such companies and the plaintiffs, and not a controversy between the. plaintiffs and West Virginia, within the meaning of the Constitution; and the question whether West Virginia may validly regulate its public service corporations in the manner attempted by the statute in litigation, involves a controversy between West Virginia and such corporations, and is not a controversy between States within the meaning of the Constitution.

The suits were not necessarily premature merely because no action was taken by West Virginia or its Public Service Commission under the statute. The suits were premature in the sense that, at the time of their commencement, the practical operation of the statute had not been tested, and no threatened injury of serious magnitude was clearly or convincingly proved, or susceptible of clear or convincing proof. *Grand Trunk Ry. Co.* v. *Michigan Railroad Comm.,* 231 U. S. 457; *Kansas* v. *Colorado,* 206 U. S. 46, 117; *Missouri* v. *Illinois,* 200 U. S. 496, 521; *New York* v. *New Jersey,* 256 U. S. 296; and other cases.

These cases must be considered in the light of the peculiar nature of gas and of the gas companies, and the exceptional rules of law applicable thereto. *Brown* v. *Spilman,* 155 U. S. 665; *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *Walls* v. *Midland Carbon Co.,* 254 U. S. 300; *Westmoreland Gas Co.* v. *Dewit,* 130 Pa. St. 235; *Bacon* v. *Walker,* 204 U. S. 311.

The statute does no more than to declare, and to prescribe appropriate procedure for the enforcement of, the obligation of each public service gas company to furnish reasonably adequate service within reasonable territorial limits. It does. not require unreasonable service or unreasonable extension by any company.

The public service gas companies were and are obligated, irrespective of the statute in contest, to furnish

West Virginia consumers a reasonably adequate supply of gas, and they cannot lawfully abandon or disable themselves from performing the obligation.

It was within the right and power of the State to regulate the gas companies. The right and power are based on: (1) The implied condition accompanying the grant of rights and privileges to the companies; (2) the reserved power to alter or repeal corporation charters and laws; and (3) the police power.

The statute is a legitimate exercise of the police power.

From the social and economic dependency on gas in reasonably adequate volume, the domestic and industrial evils resulting from the lack of such service, and the " fact accomplished " that there is now, and for several years has been, insufficient West Virginia gas to permit at once the full measure of service in West Virginia and the other States to which it was and is transported, admittedly there must be, in the nature of things, a limitation upon the service and consumption of gas, in respect of either the purposes of the consumption or the territorial area of supply.

In this situation, it was and is incumbent on some one to formulate and enforce suitable regulations. And the Congress not having acted, even in respect of the interstate transportation of gas (Act of June 18, 1910, c. 309, § 7, 36 Stat. 539, 544; *Pennsylvania Gas Co.* v. *Public Service Commission,* 252 U. S. 23, 30), the exercise of a regulatory power must emanate either from the State or from the gas companies.

As to the police power over the general subject, see *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *Walls* v. *Midland Carbon Co.,* 254 U. S. 300; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61.

The police power is " one of the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government." *District of*

*Columbia* v. *Brooke,* 214 U. S. 138, 149. As said in *Chicago & Alton R. R. Co.* v. *Tranbarger,* 238 U. S. 66, 77, " this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and . . . all contract and property rights are held subject to its fair exercise. *Atlantic Coast Line R. R. Co.* v. *Goldsboro,* 232 U. S. 548."

The public welfare to which the protection of the power extends, embraces not only public health, morals, and safety, but also the public convenience and the general prosperity. *Chicago, Burlington & Quincy R. R. Co.* v. *Illinois,* 200 U. S. 561; *Bacon* v. *Walker,* 204 U. S. 311; *Eubank* v. *Richmond,* 226 U. S. 137; *Sligh* v. *Kirkwood,* 237 U. S. 52; *Chicago & Alton R. R. Co.* v. *Tranbarger,* 238 U. S. 66.

The scope of this power, and its flexibility in meeting and dealing with modern conditions, are illustrated in *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, where state regulation of fire insurance rates was upheld; and, again, in *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539; *Caldwell* v. *Sioux Falls Stockyards Co.,* 242 U. S. 599; and *Merrick* v. *Halsey,* 242 U. S. 568, upholding " Blue Sky laws."

Measures to safeguard the business prosperity of the State are exampled by the prohibition of monopolies and combinations in restraint of trade, *Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86; *Grenada Lumber Co.* v. *Mississippi,* 217 U. S. 433; *Standard Oil Co.* v. *Missouri,* 224 U. S. 270; *International Harvester Co.* v. *Kentucky,* 234 U. S. 199; of unfair competition, *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157; and of the sale or shipment of products detrimental to the business reputation of an important industry, *Sligh* v. *Kirkwood,* 237 U. S. 50.

If it be true that in any instance the State may legislate in the interest of the health and general business prosperity of its inhabitants, it must follow that health may be preserved against injury by cold as well as by disease

or adulteration of food, and that the industry of the State may be protected as well from destruction by deprivation of necessary fuel as from mere injury by practices hurtful to its trade or reputation. Upon this ground, aside from any peculiar relations or obligations affecting public service corporations, it is plain that the State may legislate in defense of its people and its industries in prevention of a real and present danger arising from deprivation of gas.

Nor is it an answer that the State did not interpose earlier. While the gas supply was adequate there was no occasion for the exertion of the State's power. And regardless of this, the delay did not detract from the power. *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389; *Thornton* v. *Duffy,* 254 U. S. 361, 369.

Assuming, as we have already shown, that the supply of industrial gas is, by the holding out by the gas companies of their readiness and willingness to furnish such gas (subject only to the needs of domestic consumers) and by the settled law of West Virginia, a public service, *Clarksburg Light Co.* v. *Public Service Comm.,* 84 W. Va. 638; *Kelly Axe Mfg. Co.* v. *Public Service Comm.,* 87 W. Va. 105; *Mill Creek Coal Co.* v. *Public Service Comm.,* 84 W. Va. 662; there is no distinction in principle between that service and the domestic service. Between the supply of gas for domestic purposes and for industrial use there is but one difference. The service differs only in degree of necessity because the hardship is personally more acute in case of failure of the domestic supply than where the failure pertains to the industrial supply. This, of course, constitutes a sufficient basis for classification, preferential to the domestic consumer. The uses to which gas may be applied in West Virginia was and is a local question for the determination of the legislature of that State; and the objections of the plaintiffs go, as said in *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 211, " not to the

power to make the regulations, but to their wisdom."
*Lindsley* v. *Nat. Carbonic Gas Co.,* 220 U. S. 61, 76, 77;
*Walls* v. *Midland Carbon Co.,* 254 U. S. 300.

As to forebodings that the enforcement of the statute
as to industrial consumers will absorb all the West Vir-
ginia gas, these are wholly speculative, and "mere
prophecies which are ventured." *Tanner* v. *Little,* 240
U. S. 369, 385.

If a decision of the Commission as to reasonable ade-
quacy, in respect of either volume or economy of con-
sumption, is deemed erroneous, the gas companies will
have their day in court. Such questions can be answered
when they arise.

The burden being on the plaintiffs to show a violation
of constitutional guaranties there can be no declaration
of unconstitutionality upon mere loose opinion or con-
jecture.

The plaintiffs claim through the gas companies, and
have no higher right or title to relief.

The statute works no impairment of obligation of
contracts, nor does it deprive of property without due
process of law, nor deny equal protection of the laws.

If the State may validly compel the rendition of ade-
quate service to its people by public service corporations
operating within its borders, the State's authority can-
not be defeated by expenditures in aid of evasion of that
service, or contracts or arrangements having that result.

The contention that the seven companies engaged in
business, and that their pipe lines and pump stations were
constructed and are used as facilities for the service of
consumers in foreign States, is fallacious.

If fairly compensated, the gas companies are not en-
titled to refuse to West Virginia an adequate service
merely because a greater remuneration can be obtained
elsewhere.

Whatever may be the result in reference to property
devoted to the service of consumers in other States or to

contracts made with them, or consequentially affecting their service, the constitutional power of West Virginia, nevertheless, remains clear and certain.  The expenditures for that property and those contracts were made subject to the police power of the State and find no protection in the constitutional provisions against the impairment of the obligation of a contract or the deprivation of property without due process of law or any other guaranty of the State or Federal Constitution.  *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549; *Chicago & Alton R. R. Co.* v. *Tranbarger,* 238 U. S. 67; *Hudson County Water Co.* v. *McCarter,* 209 U. S. 348; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Union Dry Goods Co.* v. *Georgia Public Service Corp.,* 248 U. S. 372; *Erie R. R. Co.* v. *Board of Public Utility Commissioners,* 254 U. S. 394.

What has been said above applies equally to the claim of abridgment of privileges and immunities of citizens of other States or of the United States.  *Barbier* v. *Connolly,* 113 U. S. 27; *Western Union Tel. Co.* v. *Commercial Mill Co.,* 218 U. S. 406.

The plaintiff States are not citizens of any State or of the United States, *Stone* v. *South Carolina,* 117 U. S. 430; *Postal Tel. Cable Co.* v. *Alabama,* 155 U. S. 487; *Title Guaranty & Surety Co.* v. *Idaho,* 240 U. S. 136; and the gas companies are not citizens within the privileges and immunities clauses of the Federal Constitution.  *Blake* v. *McClung,* 172 U. S. 239; *Western Turf Association* v. *Greenberg,* 204 U. S. 359; *Selover* v. *Walsh,* 226 U. S. 112.

The statute does not regulate interstate commerce.

We think that to the objection, based on the Commerce Clause, there are several answers:

(1)  The West Virginia public service corporations have no right to engage in interstate commerce, except in subordination to the performance of their duties to the State;

(2) If interstate commerce is affected, the effect is only indirect and incidental, and therefore, in the absence of congressional enactment, the effect is not violative of the Commerce Clause; and

(3) The duties of these corporations to the State in respect of their gas exist not only during interstate commerce therein, but also before the entry of the gas into that commerce; and the gas enters interstate commerce subject to those duties and the operation of the statute.

The question here is, not whether a State may prohibit or restrict the transportation of natural gas from its territory into another State, but whether the State may require companies—owing to its people the obligation of adequate service—to perform that service, even though the performance may involve the intrastate consumption of gas which otherwise might be transported to another State.

If the gas companies owe a duty to the people of West Virginia, the performance of that duty cannot be evaded merely because they prefer to enter into interstate commerce rather than to perform it. *Hudson County Water Co.* v. *McCarter,* 209 U. S. 348; *Manufacturers Light Co.* v. *Ott,* 215 Fed. 940, 951; *South Covington Ry. Co.* v. *Kentucky,* 252 U. S. 399; *Erie R. R. Co.* v. *Public Commissioners,* 254 U. S. 394.

If it be true, that a gas company, or its business, or the commodity in which it deals, is affected by the public interest, precedents are not wanting to show that the principles relating to interstate commerce in ordinary goods and chattels are inapplicable. *Geer* v. *Connecticut,* 161 U. S. 519; *New York* v. *Hesterberg,* 211 U. S. 31.

It is no answer to what has been said that if a State can compel a supply of gas to its citizens and thereby prevent its exportation to another State, the other State may

impose a similar restriction on the interstate shipment of corn, wheat, lumber or other commodities. Those commodities lack entirely the exhaustibility and other peculiarities of gas. Until their production or distribution shall become affected with a public interest in the sense that the gas business is so affected, no such case will occur. *Tanner* v. *Little*, 240 U. S. 369; *Noble State Bank* v. *Haskell*, 219 U. S. 104; *German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389.

In *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229, neither the corporations and individuals who were plaintiffs, nor their gas, could be said to be affected with a public use, since the persons themselves were not engaged in the business of public gas supply in Oklahoma, and their gas was required by no present necessity in that State. The Oklahoma statute was not in substance, or even ostensibly, enacted in regulation of a public utility, so as to render merely indirect or incidental any decrease in the volume of gas transported out of the State. On the contrary, the principal and direct design of the Oklahoma statute was to prevent exportation of gas. *Haskell* v. *Kansas Natural Gas Co.*, 224 U. S. 217, 221.

The later decisions in *Public Utilities Comm.* v. *Landon*, 249 U. S. 236, and *Pennsylvania Gas Co.* v. *Public Service Comm.*, 252 U. S. 23, as well as *Franke* v. *Johnstown Fuel Supply Co.*, 70 Pa. Super. Ct. 446, recognize the local character of gas supply and its regulation, even though the gas has been in interstate commerce.

Interference, if any, with interstate commerce is indirect and incidental. The direct purpose of the law is to compel the performance of a public duty by those obligated to perform it, and by a legitimate exercise of the police power to protect against the injury to persons and property consequent on the failure to perform the public duty. Conceivably, interstate commerce might not be affected at all, and this is presently true, if, as the evi-

dence indicates, the gas companies hold in reserve suffi-
cient territory to supply the deficit without subtracting
from the quantity of gas transported to other States.
But even if the quantity of gas entering into interstate
commerce should be diminished as a consequence of the
statute, the authorities well establish that the Commerce
Clause would not stand in the way. To argue to the con-
trary would be to contend that the State would stand
powerless to relieve its citizens from the most flagrant
discrimination, or even against a total deprivation of gas,
at the hands of its public service corporations, which, for
gain, preferred to serve consumers in other States.

The validity of state legislation incidentally or in-
directly affecting interstate commerce, even though it
diverts to the local need commodities or facilities which
otherwise might go into or aid interstate commerce, has
repeatedly been upheld. *Minnesota Rate Cases,* 230
U. S. 352; *Kidd* v. *Pearson,* 128 U. S. 1; *Plumley* v. *Mas-
sachusetts,* 155 U. S. 461; *Capital City Dairy Co.* v. *Ohio,*
183 U. S. 238; *Geer* v. *Connecticut,* 161 U. S. 519; *New
York* v. *Hesterberg,* 211 U. S. 31; *Hudson County Water
Co.* v. *McCarter,* 209 U. S. 348; *Sligh* v. *Kirkwood,* 237
U. S. 52; *Jamieson* v. *Indiana Natural Gas Co.,* 128 Ind.
555.

The police power of the State embraces, to this extent
of indirect or incidental interference, commodities which
are actually in interstate commerce. The fact that they
are in such commerce does not necessarily withdraw them
from the operation of reasonable state laws. The re-
peatedly held valid state inspection and labelling laws,
designed to promote public health and safety, though ap-
plied to commodities in original packages, are a common-
place example. The rule is the same as to the instru-
mentalities of interstate commerce.

Though interstate commerce be incidentally or indi-
rectly affected, the police power of the State includes the

authority to compel a reasonably adequate service to the communities within it at the hands of a public service corporation, though it is engaged in interstate commerce; and up to the point where reasonably adequate local facilities are afforded by a public service corporation, the State may exercise a free hand. Until that point is passed, interstate commerce is not unconstitutionally infringed. *Chicago, Burlington & Quincy R. R. Co.* v. *Railroad Commission,* 237 U. S. 220; *Mobile, etc. R. R. Co.* v. *Mississippi,* 210 U. S. 187; *Gladson* v. *Minnesota,* 166 U. S. 427; *Lake Shore, etc. Ry. Co.* v. *Ohio,* 173 U. S. 285; *Wisconsin, etc. R. R. Co.* v. *Jacobson,* 179 U. S. 287; *Atlantic Coast Line R. R. Co.* v. *North Carolina Corp. Comm.,* 206 U. S. 1; *Missouri Pacific Ry. Co.* v. *Larabee Flour Mills Co.,* 211 U. S. 612; *Missouri Pacific Ry. Co.* v. *Kansas,* 216 U. S. 262; *Washington* v. *Fairchild,* 224 U. S. 510; *Grand Trunk Ry. Co.* v. *Michigan R. R. Comm.,* 231 U. S. 457; *Chicago, M. & St. P. Ry. Co.* v. *Iowa,* 233 U. S. 334; *Michigan Central R. R. Co.* v. *Railroad Comm.,* 236 U. S. 615; *Illinois Central R. R. Co.* v. *Mulberry Hill Coal Co.,* 238 U. S. 275; *Seaboard Air Line Ry. Co.* v. *Railroad Comm.,* 240 U. S. 324.

But the objection that interstate commerce is interfered with, fails entirely when the transaction is analyzed in point of time. The duty of reasonably adequate service rests on the gas company in its character of a public service corporation. It exists prior to and contemporaneously with its acquisition of the gas, wherewith it is to perform its duty.

That the production of gas, or coal, or any other commodity, though intended for interstate commerce, is not interstate commerce, is now settled. See *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245; *Hammer* v. *Dagenhart,* 247 U. S. 251; *Delaware, Lackawanna & Western R. R. Co.* v. *Yurkonis,* 238 U. S. 439; *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344; *Public Utilities*

*Co.* v. *Landon,* 249 U. S. 236; *Pennsylvania Gas Co.* v. *Public Service Comm.,* 252 U. S. 23; *Franke* v. *Johnstown Fuel Supply Co.,* 70 Pa. Super. Ct. 446.

Before gas can enter into interstate commerce, it must become property susceptible of such commerce. Until it is reduced to possession by being brought into the well or to the surface of the earth, there is no property in it, save as a qualified right thereto as part of the land. *Walls* v. *Midland Carbon Co.,* 254 U. S. 300; *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190; *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229; *Peoples Gas Co.* v. *Tyner,* 131 Ind. 281; *Hall* v. *Vernon,* 47 W. Va. 295.

Until reduced to possession, the gas is part of the real estate. *Brown* v. *Spilman,* 155 U. S. 665; *Carter* v. *Tyler County Court,* 45 W.. Va. 806; *Preston* v. *White,* 57 W. Va. 278; *Warren* v. *Boggs,* 83 W. Va. 89; and other cases.

It follows, therefore, that at the very moment when gas produced by or for a public service gas company becomes property, and the subject of commerce, it finds the gas company incumbered with the obligation of public service, and subject to the statute. This is true, even though the gas is straightway discharged into the pipe line. It is the more clearly true of those wells which are shut in either upon completion of the drilling or in order to rest them after a period of use.

In this aspect there is no distinction between the gas produced by the gas company itself and that purchased from other producers. *Coe* v. *Errol,* 116 U. S. 517; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245; *Champlain Realty Co.* v. *Brattleboro,* 260 U. S. 366.

*Hallanan* v. *United Fuel Gas Co.,* 257 U. S. 277, did not directly involve the question of adequacy of public service in West Virginia by the United Fuel Gas Company. We think that with the added element of the duty of public service on the part of the owner of the pipe line, the pipe

line is properly viewed, not only as an instrumentality of transportation, but also as a reservoir for the distribution of the gas, both that supplied within the State and that destined for other States. And in this light a situation is presented more nearly like that involved in *Champlain Realty Co. v. Brattleboro,* 260 U. S. 366; *Bacon v. Illinois,* 227 U. S. 504; *General Oil Co. v. Crain,* 209 U. S. 211; *American Steel & Wire Co. v. Speed,* 192 U. S. 500; *Diamond Match Co. v. Ontonagon,* 188 U. S. 82.

We think, too, the fact that in the *Hallanan Case,* much the greater part of the gas was destined to other States, as was the condition of most of the grain in *Lemke v. Farmers Grain Co.,* 258 U. S. 50, creates a distinction. These cases may apply when most of a commodity is to be taken to another State. But the question remains whether they apply to gas in a pipe line, most of which is intended for consumption within the State; and whether they will govern even in the ultimate time when by reason of the continuing depletion of the gas ninety-nine per cent. of the gas in a particular pipe line remains in West Virginia and one per cent. goes elsewhere.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

These are suits, one by the Commonwealth of Pennsylvania and the other by the State of Ohio, to enjoin the State of West Virginia from enforcing an act passed by her legislature (c. 71, Acts 1919) which the complainants believe will largely curtail or cut off the supply of natural gas heretofore and now carried by pipe lines from West Virginia into their territory and there sold and used for fuel and lighting purposes. Although distinct, the suits are so much alike that they have been presented at the bar substantially as a single case. They will be dealt with accordingly in this opinion.

The West Virginia Act is set forth at length in the margin.[1] The complainants challenge its validity on the ground that it directly interferes with interstate commerce and therefore contravenes the commerce clause of

---

[1] The Act was passed February 10, 1919, went into effect May 11, 1919, and reads as follows:

"Section 1. That every person engaged in furnishing, or required by law (whether statutory or common law) to furnish, natural gas for public use, or for the use of the public, or any part of the public, whether for domestic, industrial or other consumption, within this state, shall to the extent of his supply of said gas produced in this state, (whether produced by such person or by any other person), furnish for public use within the territory of this state, and for the use of the public and every part of the public within the territory of this state, in or from which such gas is produced, or through which said gas is transported, or which is served by such person, a supply of natural gas reasonably adequate for the purposes, whether domestic, industrial or otherwise, for which natural gas is consumed or desired to be consumed by the public, or any part of the public, within said territory in this state, and for which said consumer or consumers therein shall apply and be ready and willing to make payment at lawful rates.

"Sec. 2. That in case any person engaged in furnishing, or required by law (whether statutory or common law) to furnish, natural gas for public use within this state, or for the use of the public or any part of the public within this state, shall have a production or supply of natural gas which is, or probably will be, insufficient to furnish for such use, (for the purposes, whether domestic, industrial or otherwise, for which natural gas is consumed by the public or any part of the public), within the territory in this state served by such person, then and in that event the public service commission shall have authority, and the same is hereby conferred on it, upon the application of any such person or any of his consumers within this state and after due hearing upon notice and proof to the satisfaction of the commission that public convenience and necessity so require, to order any other person engaged in furnishing, or required by law (whether statutory or common law) to furnish, natural gas for public use within this state, and producing or furnishing natural gas for public use in said territory or transportng the same through said territory, to furnish to such person having such in-

the Constitution of the United States; and they rest their
right to relief on the grounds that to enforce the act will
subject them to irreparable injury in respect of many of
their public institutions and governmental agencies, which

---

sufficient production or supply, natural gas for the purpose of sup-
plying such deficiency, at and during such times, upon and at such
just and reasonable terms, conditions and rates, and in such
amounts, as the commission shall prescribe. And whenever, after
such hearing upon notice and proof, the commission shall determine
that public convenience and necessity so require, the commission
shall have authority to provide for and compel the establishment
of a reasonable physical connection or connections between the lines,
pipes or conduits of such person having such excess supply of gas
and the lines, pipes or conduits of the person having such deficiency
of supply, and to require the laying and construction of such reason-
able extensions of lines, pipes or conduits as may be necessary for
the establishment of such physical connection or connections, and
to ascertain, determine and fix the just and reasonable terms and
conditions of such connection or connections, including just and
reasonable rules and regulations and provisions for the payment of
the costs and expense of making the same or for the apportion-
ment of such cost and expense as may appear just and reasonable.
*Provided, however,* that no person shall, by virtue of this section,
be ordered to furnish natural gas to any other person so engaged in
furnishing, or required by law to furnish, natural gas for public use,
except to the extent that the person so ordered to furnish natural
gas shall, at the time, have a production or supply of natural gas in
excess of the quantity sufficient to furnish a reasonably adequate
supply to his consumers within this state; nor shall any person, by
virtue of this section, be ordered to furnish natural gas to any
other person so engaged in furnishing or required by law to fur-
nish, natural gas for public use in a territory within this state,
if and when the said person having said excess shall, to the ex-
tent of such excess, be ready and willing to furnish, and within such
time as the commission shall prescribe shall actually furnish, to the
consumers within said territory a reasonably adequate supply of
natural gas.

" Sec. 3. That insofar as the same shall not be in conflict with this
act, all of the authority, powers, jurisdiction and duties conferred and
imposed on the public service commission by the act entitled, 'An
act to create a public service commission and to prescribe its powers

.

long have been and now are using this gas, and will sub-
ject them to further and incalculable injury in that (a)
it will imperil the health and comfort of thousands of
their people who use the gas in their homes and are largely

and duties, and to prescribe penalties for the violations of the pro-
visions of this act,' passed February twenty-first, one thousand nine
hundred and thirteen, as amended by the act entitled, 'An act to
amend and re-enact sections one, two, three, four, five, nine, ten,
fourteen, fifteen and twenty-two, of chapter nine of the acts of one
thousand nine hundred and thirteen, creating a public service com-
mission, prescribing its powers and duties, and penalties for viola-
tion of the provisions of said chapter, and to add thereto six sections
to be known as sections twenty-three, twenty-four, twenty-five,
twenty-six, twenty-seven, twenty-eight, enlarging the powers and
duties of said public service commission, prescribing additional pen-
alties and giving to the commission power to punish for contempt,'
passed February tenth, one thousand nine hundred and fifteen, are
hereby conferred and imposed on the public service commission in
respect to the subject matter of this act, or any part thereof.

"Sec. 4. That in case of violation of any provision of this act any
person aggrieved or affected thereby may complain thereof to the
public service commission in like manner, and thereupon such pro-
cedure shall be had, as is provided in respect to other complaints to
or before said commission, and all such proceedings and remedies
may be taken or had for the enforcement or review of the order or
orders of said commission, and for the punishment of the violation
of such order or orders, as are provided by law in respect to other
orders of said commission. In case of the violation of any provisions
of this act, the public service commission, or any person aggrieved
or affected by such violation, in his own name, may apply to any
court of competent jurisdiction by a bill for injunction, petition for
writ of mandamus or other appropriate action, suit or proceeding,
to compel obedience to and compliance with this act, or to prevent
the violation of this act, or any provision thereof, pending the pro-
ceedings before said commission, and thereafter until final determina-
tion of any action, suit or proceeding for the enforcement or review
of the final order of said commission; and such court shall have
jurisdiction to grant the appropriate order, judgment or decree in the
premises.

"Sec. 5. That if any person subject to the provisions of this act
shall fail or refuse to comply with any requirement of the commis-

dependent thereon, and (b) will halt or curtail many industries which seasonally use great quantities of the gas and wherein thousands of persons are employed and millions of taxable wealth are invested.

---

sion hereunder, such person shall be subject to a fine of not less than one hundred dollars nor more than five hundred dollars for each offense; and such person, or the officers of the corporation, where such person is a corporation, may be indicted for their failure to comply with any requirement of the commission under the provisions of this act, and upon conviction thereof, may be fined not to exceed five hundred dollars, and in the discretion of the court, confined in jail not to exceed thirty days. Every day during which any person, or any officer, agent or employee of such person, shall fail to observe and comply with any order or direction of the commission, or to perform any duty enjoined by this act, shall constitute a separate and distinct violation of such order or direction of this act, as the case may be.

"Sec. 6. That any person claiming to be damaged by any violation of this act may bring suit in his own behalf for the recovery of the damage from the person or persons so violating the same in any circuit court having jurisdiction. In any such action the court may compel the attendance of the person or persons against whom said action is brought, or any officer, director, agent or employee of such person or persons, as a witness, and also require the production of all books, papers and documents which may be useful as evidence, and in the trial thereof such witness may be compelled to testify, but any such witness shall not be prosecuted for any offense concerning which he is compelled hereunder to testify.

"Sec. 7. That the word 'person' within the meaning of this act shall be construed to mean, and to include, persons, firms and corporations.

"Sec. 8. That the sections, provisions and clauses of this act shall be deemed separable each from the other, and also in respect to the persons, firms, corporations and consumers mentioned therein or affected thereby, and if any separable part of this act be, or be held to be unconstitutional or for any reason invalid or un[en]forceable, the remaining parts thereof shall be and remain in full force and effect.

"Sec. 9. That all acts and parts of acts in conflict with this act are hereby repealed."

The conditions out of which the suits have arisen and the facts material to their disposal are as follows:

Natural gas is found at pronounced depths in porous strata—usually sand rock—constituting a natural reservoir and is brought to the surface and reduced to possession through wells drilled into the containing strata. When a surface owner thus reduces it to possession he becomes its owner and it becomes a subject of commerce, like any product of the forest, field or mine. In the enclosing strata it is under great pressure, called rock pressure, which causes it to flow out rapidly when the strata are penetrated. If one surface owner drills wells and begins to draw off the gas, others desiring to exercise their common right must take the same course, for otherwise the gas under their lands may be drained out by those wells. After the gas is drawn from the enclosing strata there is no practicable mode of storing and holding it. It must be used promptly. Its chief use consists in producing heat and light by burning it. The points of use generally are in centers of population or of industry more or less remote from the places of production. The intervening transmission is effected through pipe lines. The normal rock pressure will carry the gas considerable distances and when that pressure wanes or is inadequate it can be supplemented by using compressors.

In West Virginia the production of natural gas began as much as thirty years ago and for the last fourteen years has been greater than in any other State. The producing fields include thirty-two of her fifty-five counties. At first the gas was produced only in the course of oil operations, was regarded as a nuisance and was permitted to waste into the air. But it soon came to be regarded as valuable for heating and lighting, and the economy and convenience attending its use made it a preferred fuel. Its use within the State became relatively general, but was far less than the production, so the producers turned

to neighboring States, notably Pennsylvania and Ohio, for a further market.

West Virginia sanctioned that effort. She permitted the formation under her laws of corporations for the purpose of constructing pipe lines from her gas fields into other States and carrying gas into the latter and there selling it. She also permitted corporations of other States to come into her territory for that purpose. And she extended to all these companies the use of her power of eminent domain in acquiring rights of way for their pipe lines. In no way did she then require, or assert any power to require, that consumers within her limits be preferred over consumers elsewhere. The effort to find a further market succeeded, and the gas came to be extensively carried into Pennsylvania as far as Pittsburgh and into Ohio as far as Cleveland, Toledo and Cincinnati. In that way the entire production was made of value to the producers. Land owners and lessees in the gas fields were greatly benefited and the taxable wealth of the State was largely increased. Approximately $300,000,000 were invested in the business—fully one-half in West Virginia. More than 7,000 miles of the pipe lines are in that State,—2,000 miles being trunk lines.

Some of the pipe lines reach from the producing fields to the areas of consumption in Pennsylvania and Ohio. Some connect at or near the state line with others leading to the consuming areas. All are so operated that there is a continuous flow of gas from points of production to points of use. Branch lines divert some of the gas at intervening points, but without changing the general flow. Several lines cross and recross the state boundary repeatedly.

The pipe lines are all operated as public utilities, that is, in supplying gas to the public, and this is true in Pennsylvania and Ohio as well as in West Virginia. The lines long have been and now are supplying gas to the

three States for use in their charitable, educational and penal institutions, to their counties and municipalities for use in county, city and school buildings, to local utilities serving particular communities, to the people generally in many cities and towns for use in their homes, places of business and offices, and, in seasons when there is an adequate supply, to industrial plants for use in their operation. The predominant use is for fuel purposes, that for lighting being relatively small. All gas going into Pennsylvania and Ohio is carried and supplied under prior engagements respecting its disposal,—most of it under long time contracts exacted or preferred by the purchasers or consumers.

Experience in other gas fields has shown that multiplied and prolonged drafts on the natural supply will exhaust it. Since 1916 it has been apparent that the older portions of the West Virginia fields are approaching exhaustion and that production in those fields has reached and passed its maximum. The newer portions, however, in the judgment of informed operators, will make the fields commercially productive for several years more.

Latterly during the colder months—from November 1 to May 1—the combined needs of domestic and industrial consumers have been largely in excess of the production, and the pipe line companies generally have adopted and are pursuing the policy of preferring domestic consumers during those months. All the long time contracts contain provisions admitting of such a preference. During other months, when there is little occasion for heating homes and offices, the needs of domestic consumers drop so materially that much gas may be and is supplied for industrial use without affecting the domestic use. But increased population, enlarged industry—particularly in West Virginia—and the advantages inhering in the gas as a fuel have finally resulted in a gross demand, which cannot be satisfied even in the

summer months. The present actual consumption is all that the production will sustain. The pipe line companies cannot supply more gas in West Virginia without cutting down what they carry into Pennsylvania and Ohio; nor can they carry more into Pennsylvania and Ohio without cutting down what they supply in West Virginia. In short, the situation is such that to constrain the companies to supply more gas in any one of the three States necessarily will constrain them to supply less in the other two.

In 1918, 265 billion cubic feet of gas were produced in West Virginia, 38 billion were consumed within the State without becoming available to the public and 227 billion became available in the hands of the pipe line companies. The companies supplied 70 billion to consumers in the State and carried 157 billion to consumers outside. They also brought 4 billion into the State from gas fields outside and to that extent enlarged the amount supplied to local consumers. Of that amount, 21 billion went into domestic use and 53 billion into industrial use. The major part of the gas carried into Pennsylvania went to industrial consumers, and the major part of that carried into Ohio went to domestic consumers.

The gas carried outside the State is sold for more than that used therein, but this naturally would be so, considering the additional pipe lines, compressors and labor employed in the longer transmission. The proportion marketed beyond the State has not varied much. It now is practically what it was ten years ago. Nor has there been any discrimination against consumers inside the State. They have been dealt with on the same plane as others. The companies have declined to quit the existing service to communities and consumers outside and to serve only those inside, but there is nothing invidious in this. It is in the line of fair treatment rather than discrimination.

The gas carried into Pennsylvania and Ohio, respectively, and there supplied to the State and her municipal agencies for strictly public use is not negligible, but amounts to billions of cubic feet per year. It is the fuel with which food is cooked and water heated for thousands of dependents in charitable and penal institutions, with which hundreds of school houses are heated and made comfortable for thousands of children, and with which municipal water works are operated in several cities, notably Cincinnati and Toledo. The heating and other appliances have been adjusted to its use and to make the changes incident to substituting other fuel would involve an expenditure in each State of a very large sum of public money.

In Pennsylvania the gas is used by 300,000 domestic consumers caring for 1,500,000 people, and in Ohio by 725,000 domestic consumers caring for 3,625,000 people. This is where no other natural gas service is available. To change to other fuel would require an adjustment of heating and cooking appliances at an average cost of more than $100 for each domestic consumer, or an aggregate cost exceeding $30,000,000 in Pennsylvania and $72,500,000 in Ohio.

The act whose enforcement is sought to be enjoined was passed by the legislature of West Virginia February 10, 1919, and went into effect May 11th following.[2] These suits were brought eight days thereafter by direction of the legislatures of the complainant States, and by leave of this Court. Interlocutory injunctions were prayed and granted at the outset and are still in force.

Three questions bearing on the propriety of entertaining the suits were raised soon after the suits were begun

[2] Under the state constitution the act went into effect on the expiration of ninety days after its " passage " by the legislature as distinguished from its approval by the governor. *State* v. *Mounts*, 36 W. Va. 179.

and consideration of them was postponed to the final hearing.

The first question is whether the suits involve a justiciable controversy between States in the sense of the Judiciary Article of the Constitution. We are of opinion that they do and that every element of such a controversy is present.

Each suit presents a direct issue between two States as to whether one may withdraw a natural product, a common subject of commercial dealings, from an established current of commerce moving into the territory of the other. The complainant State asserts and the defendant State denies that such a withdrawal is an interference with interstate commerce forbidden by the Constitution. This is essentially a judicial question. It concededly is so in suits between private parties, and of course its character is not different in a suit between States.

What is sought is not an abstract ruling on that question, but an injunction against such a withdrawal presently threatened and likely to be productive of great injury. The purpose to withdraw is shown in the enactment of the defendant State before set forth and is about to be carried into effect by her officers acting in her name and at her command. The State is the principal and the action of her officers rightly may be imputed to her, even though a suit for an injunction might lie against them.

The attitude of the complainant States is not that of mere volunteers attempting to vindicate the freedom of interstate commerce or to redress purely private grievances. Each sues to protect a two-fold interest—one as the proprietor of various public institutions and schools whose supply of gas will be largely curtailed or cut off by the threatened interference with the interstate current, and the other as the representative of the consuming public whose supply will be similarly affected. Both interests are substantial and both are threatened with serious injury.

Each State uses large amounts of the gas in her several institutions and schools,—the greater part in the discharge of duties which are relatively imperative. A break or cessation in the supply will embarrass her greatly in the discharge of those duties and expose thousands of dependents and school children to serious discomfort, if not more. To substitute another form of fuel will involve very large public expenditures.

The private consumers in each State not only include most of the inhabitants of many urban communities but constitute a substantial portion of the State's population. Their health, comfort and welfare are seriously jeopardized by the threatened withdrawal of the gas from the interstate stream. This is a matter of grave public concern in which the State, as the representative of the public, has an interest apart from that of the individuals affected. It is not merely a remote or ethical interest but one which is immediate and recognized by law.

In principle these views have full support in prior decisions, such as *Missouri* v. *Illinois*, 180 U. S. 208, 241; s. c. 200 U. S. 496, 518; *Kansas* v. *Colorado*, 185 U. S. 125, 141–143; s. c. 206 U. S. 46, 95–99; *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230, 237; *New York* v. *New. Jersey*, 256 U. S. 296, 301, and *Wyoming* v. *Colorado*, 259 U. S. 419, 464. The defendant State relies on such cases as *New Hampshire* v. *Louisiana*, 108 U. S. 76; *Louisiana* v. *Texas*, 176 U. S. 1; *Kansas* v. *United States*, 204 U. S. 331; *Oklahoma* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 220 U. S. 277, and *Texas* v. *Interstate Commerce Commission*, 258 U. S. 158, 162, but the facts on which they turned, as the opinions show, were so widely different from those here that they are not in point.

The second question is whether the suits were brought prematurely. They were brought a few days after the West Virginia act went into force. No order under it had been made by the Public Service Commission; nor

had it been tested in actual practice. But this does not prove that the suits were premature. Of course they were not so, if it otherwise appeared that the act certainly would operate as the complainant States apprehended it would. One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.

Turning to the act, we find that by its first section it lays on every pipe line company a positive duty,—to the extent of its supply of gas produced in the State, whether produced by it or others,—to satisfy the needs, whether for domestic, industrial or other use, of all intending consumers, whether old or new, who are willing to pay for the gas and want it for use within the section of the State in which it is produced, in that through which it is transported or in that wherein it is supplied to others. This is a substantive provision whose terms are both direct and certain, and to which immediate obedience is commanded. No order of the commission is required to give it precision or make it obligatory, and it leaves nothing to the discretion of those who are to enforce it. On the contrary, it prescribes a definite rule of conduct and in itself puts the rule in force. It imposes an unconditional and mandatory duty, as counsel for the State admit, and obviously is intended to enforce a preferred recognition and satisfaction of the needs of consumers within the State, present and prospective, regardless of the effect on the interstate stream or on consumers outside the State.

The second section invests the commission with authority,—on finding after notice and hearing that a company supplying gas for local needs is or probably will be without an adequate supply for the purpose,—to order another company having gas in excess of what is required for its " consumers within this State " to furnish

the company whose supply is or will be inadequate with gas to make up the deficiency, or in the alternative to undertake itself to supply such local needs " to the extent of such excess." This provision, like the first, shows the purpose to give local consumers, present and prospective, a preferred status and to permit surplus gas only to be carried into other States.

The fourth section empowers the commission to entertain complaints by persons aggrieved or affected by any " violation " of the act and to require that the violation be discontinued and the act obeyed, subject to a right of review in the courts, and also provides means of compelling obedience to the act pending the proceedings before the commission and until the decision on review.

Other sections contain penal and remedial provisions designed to make those just described effective. One in the fifth section declares that " every day " during which any company, or any of its officers, agents or employees, " shall fail to observe and comply with any order or direction of the commission, or to perform any duty enjoined by this act, shall constitute a separate and distinct violation." Another in the sixth section subjects any company violating the act to an action for damages by anyone claiming to have been wronged by the violation.

We regard it as entirely clear that the act is intended to compel the retention within the State of whatever gas may be required to meet the local needs for all purposes, and that its procedural, penal and remedial provisions are amply adequate to accomplish that result. And we think it equally clear from the allegations in the bills, now established by the evidence, that the situation when the suits were brought was such that the act directly and immediately would work a large curtailment of the volume of gas moving into the complainant States. Indeed, the conclusion is unavoidable that with the increasing demand in West Virginia and the decreasing production

the act in a few years would work a practical cessation of the interstate stream.

It must be held therefore that the suits were not brought prematurely.

The third question is whether the requisite parties have been brought into the suits. It is objected that the pipe line companies have not been brought in. But there is nothing which makes their presence essential. The complainant States make no complaint and seek no relief against them. They are supplying gas in those States and evidently will continue to do so, if not restrained or prevented by the defendant State. It is only with her that the complainant States are in controversy. It also is objected that the consumers in the defendant State who will be benefited if the act is enforced have no representation in the suits. But this is a misconception. They are represented by that State, and there is nothing in the situation requiring that they be specially represented or brought in. With equal basis it could be objected in a suit to prevent the enforcement of a statute reducing railroad freight rates, or in one to prevent the enforcement of a municipal ordinance reducing telephone or electric light rates, that shippers or users who would be benefited by the reduction must be specially represented or brought in. Such an objection would of course be untenable; and so of the objection here.

We turn now to the principal issue, whether a State wherein natural gas is produced and is a recognized subject of commercial dealings may require that in its sale and disposal consumers in that State shall be accorded a preferred right of purchase over consumers in other States,—when the requirement necessarily will operate to withdraw a large volume of the gas from an established interstate current whereby it is supplied in other States to consumers there. Of course, in the last analysis, the question is whether the enforced withdrawal for the bene-

fit of local consumers is such an interference with inter-
state commerce as is forbidden to a State by the Consti-
tution. The question is an important one; for what one
State may do others may, and there are ten States from
which natural gas is exported for consumption in other
States. Besides, what may be done with one natural
product may be done with others, and there are several
States in which the earth yields products of great value
which are carried into other States and there used. But,
notwithstanding the importance of the question, its solu-
tion is not difficult. The controlling principles have been
settled by many adjudications,—some so closely in point
that the discussion here may be relatively brief.

By the Constitution, Art. I, § 8, cl. 3, the power to
regulate interstate commerce is expressly committed to
Congress and therefore impliedly forbidden to the States.
The purpose in this is to protect commercial intercourse
from invidious restraints, to prevent interference through
conflicting or hostile state laws and to insure uniformity
in regulation. It means that in the matter of interstate
commerce we are a single nation—one and the same
people. All the States have assented to it, all are alike
bound by it and all are equally protected by it. Even
their power to lay and collect taxes, comprehensive and
necessary as that power is, cannot be exerted in a way
which involves a discrimination against such commerce.
*Ward* v. *Maryland,* 12 Wall. 418, 430; *Welton* v. *Mis-
souri,* 91 U. S. 275, 280; *Webber* v. *Virginia,* 103 U. S.
344, 350; *Coe* v. *Errol,* 116 U. S. 517, 525–526; *Guy* v.
*Baltimore,* 100 U. S. 434, 442–443; *Robbins* v. *Shelby
County Taxing District,* 120 U. S. 489, 498.

Natural gas is a lawful article of commerce and its
transmission from one State to another for sale and con-
sumption in the latter is interstate commerce. A state
law, whether of the State where the gas is produced or
that where it is to be sold, which by its necessary opera-

tion prevents, obstructs or burdens such transmission is a regulation of interstate commerce,—a prohibited interference. *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229; *Public Utilities Commission* v. *Landon,* 249 U. S. 236, 245; *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277; *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, 290–291; *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50; *Western Union Telegraph Co.* v. *Foster,* 247 U. S. 105; *Minnesota* v. *Barber,* 136 U. S. 313; *Brimmer* v. *Rebman,* 138 U. S. 78. The West Virginia act is such a law. Its provisions and the conditions which must surround its operation are such that it necessarily and directly will compel the diversion to local consumers of a large and increasing part of the gas heretofore and now going to consumers in the complainant States, and therefore will work a serious interference with that commerce.

But it is urged that there are special considerations which take the act out of the general rule and sustain its validity, even though there be an interference.

One of these is that the pipe line companies are engaged in supplying the gas to the public in West Virginia, that this is a quasi-public business and that the act does no more than require the companies to furnish a reasonably adequate service within reasonable territorial limits. It is true that the business is of a quasi-public character, but it is so in Pennsylvania and Ohio as well as in West Virginia. The obligations inhering in it and the power to insist on an adequate service are the same in all three States. The supply of gas necessarily marks the extent of the service that can be rendered. Much of the business is interstate and has grown up through a course of years. West Virginia encouraged and sanctioned the development of that part of the business and has profited greatly by it. Her present effort, rightly understood, is to subordinate that part to the local business within her borders. In other words, it is in effect an attempt to

regulate the interstate business to the advantage of the local consumers. But this she may not do. A direction to one of her railroads when short of facilities for moving coal to haul intrastate coal to the exclusion of interstate coal would not be different in kind or force.

Another consideration advanced to the same end is that the gas is a natural product of the State and has become a necessity therein, that the supply is waning and no longer sufficient to satisfy local needs and be used abroad, and that the act is therefore a legitimate measure of conservation in the interest of the people of the State. If the situation be as stated, it affords no ground for the assumption by the State of power to regulate interstate commerce, which is what the act attempts to do. That power is lodged elsewhere. A contention, in essence the same, was presented and considered in *West* v. *Kansas Natural Gas Co.*, 221 U. S. 229, a case involving the validity of an Oklahoma statute designed to accomplish the retention of natural gas within the State. In the District Court the case had been heard on bill and answer, a proceeding in which the allegations of fact in the answer are taken as true. The hearing resulted in a decree adjudging the statute invalid and enjoining its enforcement. The decree was affirmed here. In the answer, as the opinion shows, it was alleged that physical conditions made it apparent that the gas field was of relatively short duration, that cities were near the field and their people needed the gas, that the State embodied only prairie land devoid of timber and there was no local fuel supply excepting coal and natural gas, that the production of coal was growing rapidly more costly, that " substantially, the only natural, practical, usable fuel, both for domestic and industrial use, is natural gas," and that if pipe lines, such as the plaintiffs were intending to construct and put in operation, were permitted to carry gas into other States the supply would be speedily ex-

hausted. Referring to these allegations and to a con-
tention that the ruling principle of the statute was con-
servation of a needed natural resource, the Court said
(p. 255):

" The results of the contention repel its acceptance.
Gas, when reduced to possession, is a commodity; it be-
longs to the owner of the land, and, when reduced to pos-
session, is his individual property subject to sale by him,
and may be a subject of intrastate commerce and inter-
state commerce. The statute of Oklahoma recognizes it
to be a subject of intrastate commerce, but seeks to pro-
hibit it from being the subject of interstate commerce,
and this is the purpose of its conservation. In other
words, the purpose of its conservation is in a sense com-
mercial—the business welfare of the State, as coal might
be, or timber. Both of those products may be limited in
amount, and the same consideration of the public welfare
which would confine gas to the use of the inhabitants of
a State would confine them to the inhabitants of the
State. If the States have such power a singular situation
might result. Pennsylvania might keep its coal, the
Northwest its timber, the mining States their minerals.
And why may not the products of the field be brought
within the principle? Thus enlarged, or without that en-
largement, its influence on interstate commerce need not
be pointed out. To what consequences does such power
tend? If one State has it, all States have it; embargo may
be retaliated by embargo, and commerce will be halted
at state lines. And yet we have said that ' in matters of
foreign and interstate commerce there are no state lines.'
In such commerce, instead of the States, a new power
appears and a new welfare, a welfare which transcends
that of any State. But rather let us say it is constituted
of the welfare of all of the States and that of each State
is made the greater by a division of its resources, natural
and created, with every other State, and those of every

other State with it. This was the purpose, as it is the result, of the interstate commerce clause of the Constitution of the United States. If there is to be a turning backward it must be done by the authority of another instrumentality than a court."

Finally, it is urged that this Court can not prescribe and execute regulations respecting the apportionment and use of the gas among the three States, and therefore that the bills should be dismissed. The conclusion does not follow from the premise. The object of the suits is not to obtain decretal regulations, but to enjoin the enforcement of the West Virginia act on the ground that it is an unconstitutional enactment and its intended enforcement will subject the complainant States to injury of serious magnitude. On full consideration, we reach the conclusion that the act is unconstitutional, that the apprehensions of the complainant States respecting the injury which will ensue from its enforcement are well founded and that it obviously will operate most inequitably against those States. In this situation the appropriate decree is one declaring the act invalid and enjoining its enforcement. To dismiss the bills and leave the act to be enforced would be quite inadmissible. If there be need for regulating the interstate commerce involved, the regulation should be sought from the body in whom the power resides.

*Decrees for complainants.*

Mr. Justice Holmes.

The statute seeks to reach natural gas before it has begun to move in commerce of any kind. It addresses itself to gas hereafter to be collected and states to what uses it first must be applied. The gas is collected under and subject to the law, if valid, and at that moment it is not yet matter of commerce among the States. I think that the products of a State until they are actually started to a point outside it may be regulated by the

State notwithstanding the commerce clause. In *Oliver Iron Mining Co.* v. *Lord,* 262 U. S. 172, it was held that the State might levy an occupation tax upon the mining of iron ore equal to six per cent. of the value of the ore produced during the previous year, although substantially all the ore left the State and was put upon cars for that purpose by the same single movement by which it was severed from its bed. There could not be a case of a State's product more certainly destined to interstate commerce. It was put upon the cars by the same act by which it was produced. But as it was not yet in interstate commerce the tax was sustained. I know of no relevant distinction between taxing and regulating in other ways. *McCulloch* v. *Maryland,* 4 Wheat. 316, 431.

But the States have been held authorized to regulate in other ways more closely resembling the present. In *Sligh* v. *Kirkwood,* 237 U. S. 52, a state law was sustained that made it criminal to sell or offer for shipment citrus fruits that were immature or otherwise unfit for consumption. That, upon grounds of local policy, intercepted before it got into the stream, what would have been an object of interstate commerce. The local interest in the present case is greater and more obvious than in that of green oranges. Again, the power of the State to preserve a food supply for its people by game laws notwithstanding an indirect interference with interstate commerce is established. *Geer* v. *Connecticut,* 161 U. S. 519, 534. *Silz* v. *Hesterberg,* 211 U. S. 31, 42. If there is any difference between the property rights of the State in game and in gas still in the ground it does not concern the plaintiffs and it is plain from the decisions cited that they do not depend upon a speculative view as to title. See *Missouri* v. *Holland,* 252 U. S. 416, 434. The right of the State so to regulate the use of natural gas as to prevent waste was sustained as against the

Fourteenth Amendment in *Walls* v. *Midland Carbon Co.,*
254 U. S. 300, and I do not suppose. that the plaintiffs
would have fared any better had they invoked the com-
merce clause. I need do no more than refer to prohibi-
tion of manufacture of articles intended· for export, such
as colored oleomargarine; *Capital City Dairy Co.* v. *Ohio,*
183 U. S. 238, 245; or spirits. The result of that and
other cases has been expressed by this Court more than
once in the form of a general recognition of the right of a
State to make "reasonable provision for local needs";
*Minnesota Rate Cases,* 230 U. S. 352, 402, 410, 411; and
the right has been recognized even when the interference
with interstate commerce is direct, as when an interstate
train is required to stop to accommodate passengers who
do not leave the State. *Lake Shore & Michigan South-
ern Ry. Co.* v. *Ohio,* 173 U. S. 285. *Gulf, Colorado &
Santa Fe Ry. Co.* v. *Texas,* 246 U. S. 58.

I see nothing in the commerce clause to prevent a
State from giving a preference to its inhabitants in
the enjoyment of its natural advantages. If the gas
were used only by private persons for their own pur-
poses I know of no power in Congress to require
them to devote it to public use or to transport it across
state lines. It is the law of West Virginia and of
West Virginia alone that makes the West Virginia gas
what is called a public utility, and how far it shall be
such is a matter that that law alone decides. I am aware
that there is some general language in *Oklahoma* v. *Kan-
sas Natural Gas Co.,* 221 U. S. 229, 255, a decision that I
thought wrong, implying that Pennsylvania might not
keep its coal, or the northwest its timber, &c. But I con-
fess I do not see what is to hinder. Certainly if the
owners of the mines or the forests saw fit not to export
their products the Constitution would not make them
do it. I see nothing in that instrument that would pro-
duce a different result if the State gave the owners

motives for their conduct, as by offering a bonus. However far the decision in the case referred to goes it cannot outweigh the consensus of the other decisions to which I have referred and that seem to me to confirm what I should think plain without them, that the Constitution does not prohibit a State from securing a reasonable preference for its own inhabitants in the enjoyment of its products even when the effect of its law is to keep property within its boundaries that otherwise would have passed outside. *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 357.

I agree substantially with my brothers McReynolds and Brandeis, but think that there is jurisdiction in such sense as to justify a statement of my opinion upon the merits of the case. I think that the bill should be dismissed.

Mr. Justice McReynolds, dissenting.

It seems to me quite clear that the record presents no justiciable controversy; certainly none within the original jurisdiction of this Court.

For the manifest purpose of protecting local consumers, West Virginia commanded her public service corporations not to transport natural gas beyond the borders of the State until they had satisfied the reasonable requirements of the people therein. Thereupon, complainants came here by original bills and alleged that if the statute were enforced they and their inhabitants could not obtain enough gas for their imperative demands from the divers pipe lines theretofore accustomed to supply them. They ask us to declare the enactment invalid because of conflict with the commerce clause of the Federal Constitution and to restrain its enforcement. If the pipe lines hereafter fail to comply with their contracts, of course, they may be proceeded against in a proper forum; but to say that they probably will fail because

of the statute and then to demand that the law-making power be enjoined is not to set up a real controversy cognizable in any court.

If West Virginia should prohibit the drilling of new gas wells, I hardly suppose complainants could demand an injunction here even if it were admitted that their supplies would be cut off. But why not, under the doctrine announced? Production has been permitted for years and appealing hardships would follow its cessation. And suppose West Virginia should repeal the charters of all her public service corporations now transporting gas and thereby disable them, could we interfere upon the demand of another State who claimed that she would suffer?

As originally adopted, the Constitution provided—" In all cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction." *Chisholm* v. *Georgia,* 2 Dall. 419, declared that a citizen of one State could proceed against another State by original action here. In *Louisiana* v. *Texas,* 176 U. S. 1, Mr. Chief Justice Fuller pointed out the character of controversies between States over which this Court has original jurisdiction. With emphasis he declared that vindication of the freedom of interstate commerce is not committed to any State as *parens patriae.* Unless this ruling is to pass into the discard, it follows that neither of the complainants has any higher standing than one of her citizens with a contract for gas would have if there were no Eleventh Amendment. It is unnecessary to argue that the framers of the Constitution never intended to empower this Court, at the suit of an individual, to enjoin a State from enforcing regulations prescribed for her own public service corporations. And yet, that possibility must be affirmed under the doctrine now announced.

Concluding his opinion in *Chisholm* v. *Georgia* (1793), Mr. Justice Iredell exclaimed—" I pray to God, that if the Attorney General's doctrine, as to the law, be estab-. lished by the judgment of this Court, all the good he predicts from it may take place, and none of the evils with which, I have the concern to say, it appears to me to be pregnant." A like prayer seems not inappropriate here and now.

MR. JUSTICE BRANDEIS, dissenting.

The statement made by Mr. Justice Holmes seems to me unanswered. But, like Mr. Justice McReynolds, I think that there are reasons why the bills should be dismissed without passing upon the constitutional question presented.

Natural gas in quantity is produced in thirty-two of the fifty-five counties of West Virginia. One-half of the inhabitants of that State have for years been dependent upon it for domestic uses; and it has been supplied to nearly two thousand industrial establishments. Sixty-seven concerns are engaged in the business of distributing this natural gas to the public. Most of them are corporations organized under the laws of West Virginia. A few are organized under the laws of some other State. Some are unincorporated. Each had, prior to the Act of February 17, 1919, hereinafter referred to, been declared by statute to be a public service corporation[1] endowed with the power of eminent domain. Each was under the common-law duty of furnishing to the public,

---

[1] " The words ' Public Service Corporation ' used in this act shall include all persons, associations of persons, firms, corporations, municipalities and agencies engaged or employed in any business herein enumerated, or in any other public service business whether above enumerated or not, whether incorporated or not." Acts, 1913, c. 9, § 3; Acts, 1915, c. 8, § 3; Acts, 1921, c. 150, § 3. See Acts 1919, c. 71, § 3.

throughout the West Virginia territory in which it does business, adequate service. *Carnegie Natural Gas Co.* v. *Swiger,* 72 W. Va. 557; *Clarksburg Light & Power Co.* v. *Public Service Commission,* 84 W. Va. 638. And as to each this duty has been confirmed by the legislation of that State.

Prior to the World War the production of natural gas in West Virginia and the demand were such that large quantities could be exported by its public service corporations to other States without thereby lessening the ability of these concerns to give adequate service to their West Virginia customers. During the war the demand, both within and without the State, increased greatly; and thereafter the supply became smaller. Of the net supply of West Virginia natural gas available for distribution by its public service corporations, 77.1 per cent. was exported in the year 1916; 80.1 per cent. in 1917; 76.7 per cent. in 1918.[2] The West Virginia consumers complained that the amount furnished them was inadequate; and that they were being discriminated against by West Virginia gas companies in the interest of residents of other States.[3]

---

[2] A large part of the gas produced is not available for distribution to the public. Much is consumed within the State for field purposes—such as drilling and cleaning out wells or the operation of compressor or pump stations to transport the gas. The producer must, also, under reservations in the leases, ordinarily deliver to the landowner free gas service.

[3] The temptation to discriminate may have been great. For Pennsylvania and Ohio communities formerly supplied from local production of natural gas could, if this is no longer possible, afford to pay a very high price for gas rather than to discard existing gas appliances and to instal new ones which would be required if oil or coal were to be substituted as fuel. In 1921 the average price per M cubic feet for domestic consumption was 26 cents in West Virginia, 44 cents in Pennsylvania and 42 cents in Ohio. For industrial consumption it was 16 cents in West Virginia; 32 cents in Pennsylvania; and 34 cents in Ohio. United States Geological Survey, "Natural Gas in 1919–1921," published May 22, 1923.

Some of the companies which exported gas sought to justify the inadequacy of their service to West Virginia customers by asserting that they were under contract, or other duty, to supply West Virginia gas to distributing companies or consumers in other States; and that the aggregate demand of their customers in the several States exceeded the available supply. Only twelve of the sixty-seven West Virginia public service corporations took part in the export business. The remaining fifty-five were engaged solely in distribution within the State; and many of these were dependent largely upon the other twelve for their gas supply. Some of these fifty-five companies sought to justify their inadequate service by the fact that, because of the demands for gas to be exported to the other States, the corporations on which they were dependent denied them their full supply.

West Virginia consumers insisted that the common law forbade its public service companies to so disable themselves from performing their duty to give adequate service within the State; and contended that the exporting public service corporations which habitually supplied the local distributing companies could not justify furnishing a reduced supply by setting up their contracts to furnish supplies to concerns in other States. These contentions were denied by the exporting companies; and it was asserted that they could not legally be controlled in this respect by the Public Service Commission of West Virginia. To remove all doubt concerning the statutory powers of the Commission and to ensure adequate service to West Virginia consumers, the legislature of the State enacted c. 71 of the Acts of 1919, approved on February 17 of that year, to take effect ninety days after its passage. That statute declared these rules of substantive law:

(a) That no public service corporation engaged in distributing natural gas produced within the State shall, by exporting its supply to other States, disable itself from

performing its duty to give adequate service within West Virginia.

(b) That any such public service corporation whose gas supply is insufficient to afford such service to its customers, may, under prescribed conditions, call upon any other public service corporation within the same territory which has a surplus supply, to furnish to it such part of this surplus as may be required to enable it to give adequate service.

Before the effective date of that act, the State of Pennsylvania and the State of Ohio each filed in this Court a bill in equity against the State of West Virginia, in which it prayed that the act be declared void, because obnoxious to the Federal Constitution, and that all West Virginia officials be enjoined from attempting in any way to enforce the statute. As a basis for the relief each bill set forth the extensive use of natural gas by state institutions, by their several municipalities, and by millions of residents; and it alleged that serious injury would result if these consumers were deprived of the West Virginia supply. The Ohio bill alleged also that cutting off the West Virginia supply of natural gas would greatly reduce the value of public service properties, would reduce taxable values of these and other properties, and would thereby deprive the State of important revenues. It prayed, specifically, that the plaintiff State, and its residents, be declared to have no adequate remedy at law; that West Virginia and its officials be enjoined from interfering with the transportation of natural gas for use in Ohio; and that pending the suit an injunction be granted against their instituting in any court of the State of West Virginia any suit under the statute against any " person, company or corporation which is engaged in the production or transportation of natural gas out of the State of West Virginia and into the State of Ohio." No public official or producer, exporter or distributor of gas or consumer (other than

these States) was made party plaintiff or defendant in either bill. A temporary injunction issued in each case upon the filing of the bill. In each a motion to dismiss, an answer, and a replication were filed. Without disposing of the motions to dismiss, the parties proceeded to take the evidence and, thereafter, submitted the cases for final hearing.

Several objections made to the maintenance of these suits may be passed without discussion. It will be assumed that the constitutional question submitted is not to be deemed merely a political one, as in *Georgia* v. *Stanton,* 6 Wall. 50, and *Massachusetts* v. *Mellon, ante,* 447. It will be assumed that the alleged right to acquire by purchase and to bring into a State natural gas produced elsewhere is—despite a fundamental difference[4]— to be treated as similar legally to the right asserted in *Kansas* v. *Colorado,* 185 U. S. 125; 206 U. S. 46, to have the water of an interstate stream continue to flow into a State; or the right recognized in *Missouri* v. *Illinois,* 180 U. S. 208; *New York* v. *New Jersey,* 256 U. S. 296, and *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, to have the waters and the air within one State kept reasonably free from pollution originating in another. It will be assumed, further, that the use of natural gas in Pennsyl-

---

[4] The State has a property interest in running water naturally flowing into it and in the public waters and air within its boundaries. *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237. If the running water is withheld, its property is taken. If the public waters or the air is polluted, its territorial integrity is invaded. But the alleged right to purchase in interstate commerce and to import a natural resource is, in no sense, a right of the State. It would be described appropriately as a privilege of citizens of the United States. Compare *Louisiana* v. *Texas,* 176 U. S. 1, 24, 25. Such privileges the State is not charged by the Federal Constitution with the duty to enforce; and the fact that the institution of these suits was specially authorized by the legislatures of Pennsylvania and of Ohio can be of no legal significance.

vania and in Ohio is shown to be so general as to bring these suits within the rule acted upon in the cases just cited and to render inapplicable the rule declared in *Kansas* v. *United States,* 204 U. S. 331, and *Oklahoma* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 220 U. S. 277, 286, 289, where the suits were dismissed because brought in aid of interests deemed private. And finally it will be assumed—although this is still more doubtful—that a State which has permitted one of its natural resources to be freely dealt in as an article of interstate commerce may not thereafter prohibit all export thereof, although it appears that the whole of the remaining supply will be required to satisfy the needs of its own citizens. These objections raised by defendant will not be considered; because there are other objections which, in my opinion, present insuperable obstacles to the maintenance of the suits.

*First.* This Court is without jurisdiction of the subject-matter.

The bills present neither a " case," nor a " controversy," within the meaning of the Federal Constitution. *Marbury* v. *Madison,* 1 Cr. 137; *Muskrat* v. *United States,* 219 U. S. 346, 356, 359; *Texas* v. *Interstate Commerce Commission,* 258 U. S. 158. They are not proceedings " instituted according to the regular course of judicial procedure " to protect some right of property or personal right. They are, like *McChord* v. *Louisville & Nashville R. R. Co.,* 183 U. S. 483, 495, an attempt to enjoin, not executive action, but legislation. They are instituted frankly to secure from this Court a general declaration that the West Virginia Act of February 17, 1919, is unconstitutional. Compare *Giles* v. *Harris,* 189 U. S. 475, 486. The well settled rule that the Court is without power to entertain such a proceeding applies equally, whether the party invoking its aid is a State or a private person. And the rule cannot be overcome by giving to

pleadings the form of a bill in equity for an injunction. Compare *Fairchild* v. *Hughes,* 258 U. S. 126; *Atherton Mills* v. *Johnston,* 259 U. S. 13, 15; *Texas* v. *Interstate Commerce Commission, supra.*

Moreover, it is not shown that there is, in a legal sense, danger of invasion of the alleged rights. It is shown that the States of Pennsylvania and Ohio are, in their public institutions, themselves consumers of West Virginia gas— a " makeweight " as suggested in *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237. And it is shown that these and many other consumers within .the plaintiff States would suffer serious injury if the West Virginia supply were cut off. But it is not shown that discontinuance of the supply is threatened or that there is, in a legal sense, danger that the supply will be stopped. The mere enactment of the statute, obviously, does not constitute a threat to interrupt the flow of gas into the plaintiff States. The importation into Ohio and Pennsylvania is conducted, not by the State of West Virginia, but wholly by twelve privately owned public service corporations. If the importation ceases it will be, primarily at least, because of acts or omissions .of these twelve corporations. Yet there is not even an allegation that these corporations threaten, or intend, to discontinue the importation; or that they will be compelled to do so unless the State of West Virginia is enjoined from enforcing the statute.

On the other hand, it clearly appears that, under the laws of West Virginia, there can be no present danger that any of these twelve corporations will be summarily prevented by that State from continuing in· full volume the export .of gas or will be compelled to reduce it. The only restriction, if any, imposed by the Act of 1919 upon exportation of gas is that which may result from the requirement that West Virginia public service corporations shall not, by means of export, disable themselves from performing their duties to consumers and to other dis-

tributing companies within the State. Before there can be, in a legal sense, danger that restriction will result, it must appear that one or more of the twelve exporting companies is disabling itself by such exportation, or is about to do so; and also that some state official is about to take effective action to prevent the exportation. But under the legislation of West Virginia many things would have to happen and much time must elapse before any of the exporting corporations would be under any legal duty to discontinue or lessen their exports, and still more time before it could actually be prevented from exporting gas. For, under West Virginia legislation, no executive officer and no court has power or jurisdiction to declare, or to enforce performance of, such alleged duty of a public service corporation until primary resort has been had to the Public Service Commission and the application to it has been acted upon, either by granting or by denying relief. *United Fuel Gas Co.* v. *Public Service Commission*, 73 W. Va. 571; *State* v. *Bluefield Water Works Co.*, 86 W. Va. 260; *Kelly Axe Manufacturing Co.* v. *United Fuel Gas Co.*, 87 W. Va. 368. The act establishing the Commission prescribes the methods and the remedies which are to be pursued in order to enforce the duty to give adequate service. C. 9, Acts of 1913, §§ 11 and 18; c. 8, Acts of 1915, §§ 23, 24; c. 71, Acts of 1919; c. 150, Acts of 1921; *Manufacturers' Light & Heat Co.* v. *Ott*, 215 Fed. 940. If it is claimed that there is failure to give adequate service, a petition may be filed before the Commission to secure it. After notice to and hearing of the corporation by the Commission an order may be made. Until the Commission issues some order which purports to restrict in some way the discretion theretofore exercised by a corporation in respect to exports, every such concern is, under the Act of 1919, legally as free to continue the transportation of gas to Pennsylvania and to Ohio as if that statute had not been passed.

It is possible that the Commission would never be
called upon to act.[5]  It is possible that if called upon, the
Commission would refuse to make an order.  It is pos-
sible that if the Commission made an order, the order
would be of such a character as not to affect seriously
the interests which plaintiffs seek to protect.  And it is
possible that if any order were made, the state court
would suspend its operation and would eventually an-
nul it.  The act makes such careful provision for judicial
review of the orders of the Commission and for postpon-
ing the incidence of penalties or other liabilities until

[5] The Attorney General of Ohio states in his brief: " The supply
of gas was adequate, both for consumption inside the State of West
Virginia and for transportation to other States, until during the time
of the world war in 1917 and 1918.  (Record, pages 331 and 334.)
By reason of the vast demand for gas for industrial consumption,
which occurred as a result of the war, and which drew upon the
lines of the gas companies during the summer as heavily as, or
more heavily than during the winter, the gas companies had no
opportunity to rest their wells or to accumulate a surplus of gas,
as they had been in the habit of doing, in accord with good prac-
tice, under normal conditions.  The federal government, through the
fuel administration, gave orders to the gas companies to supply
essential industrial plants with all the gas possible.  Wells were
drilled and turned into lines which, under normal conditions, would
have been held in reserve, to assure a future supply.  (Record,
pages 333, 334.)  The supply of gas has never been adequate for
all purposes, during periods of maximum demand, since that time."
It may be that production will increase.  The war has closed.
The excessive post war activities of 1919 and early 1920 ceased,
and were followed by a period of industrial depression.  There may
again be opportunity for periodic rest which gas wells, as well as
human beings, appear to need; and thus, seemingly exhausted wells
may be restored.  Furthermore, hitherto undeveloped gas areas may
be worked or more wells may be drilled in areas already developed;
or new areas may be opened.  For of the 2,725,798 acres of the
gas territory held by the sixty-seven public service corporations of
the State in 1919, a large part are still undeveloped.
Moreover, the demand may lessen.  Except in times of emergency,
use of natural gas by the industries will be determined largely by

after such review can be had, that there could never be
occasion for invoking in respect to this statute the doc-
trine of *Ex parte Young,* 209 U. S. 123.[6]  For the Com-
mission is without power to enforce an order or to im-
pose a penalty.  To overcome disobedience, or disregard,
of an order, resort must, under the West Virginia stat-
utes, be had to the courts; and to this end an original
proceeding must be instituted.  Whether the suit
to enforce obedience is brought by the Commission
or by others, the corporation is given opportunity to
defend on the ground that the order is, for any rea-

its relative cost as compared with coal or oil.  The demands of
economy in manufacture may alone compel a reduction of its use
in industry and thus, for some time, leave the supply ample for
domestic purposes.  In 1920 Pennsylvania used for manufacturing
purposes three times as much natural gas as it imported from West
Virginia in 1921.  U. S. Geological Survey, "Natural Gas, 1919–
1921," published May 22, 1923, pp. 347, 355.  Domestic consump-
tion amounts to only 30 or 40 per cent of the total consumption.
U. S. Geological Survey, "Natural Gas, 1919–1921," *supra,* p. 352.
Moreover, the present large waste may be stopped.  The waste in
Ohio in 1919 was 12 per cent.; in 1920 it was 18 per cent.; in 1921
it was 19 per cent.  On the other hand in West Virginia the waste in
1919 was only 1 per cent.; in 1920 and 1921 only 2 per cent.  "Nat-
ural Gas," *supra,* p. 352.

  [6] The situation is wholly unlike that presented in *Savage* v. *Jones,*
225 U. S. 501, 520, 521, which is relied upon by plaintiffs.  There
the suit was against the State Chemist, the executive official vested
with power to act, and he had "threatened the complainant that in
default of such compliance he would cause the arrest and prosecution
of every person dealing in the article within the State and had
distributed broadcast throughout the State warning circulars."

  Moreover, even if the West Virginia statute were construed as
imposing penalties for disobedience so severe and menacing as to
require the interposition of a federal court, it would be the public
service corporations of West Virgnia—not the States of Pennsyl-
vania and Ohio—which would thereby be denied due process of law
under the doctrine of *Ex parte Young.*  And it is those corporations
which would have to sue, as in *Oklahoma Operating Co.* v. *Love,*
252 U. S. 331, here relied upon by plaintiffs.

son, invalid.   Or it may itself inaugurate the proceeding by bringing suit to have the order annulled.   *Randall Gas Co.* v. *Star Glass Co.,* 78 W. Va. 252, 256; *United Fuel Gas Co.* v. *Public Service Commission,* 73 W. Va. 571.   Moreover, a final order of the Commission is not enforceable, even by a court, until thirty days after entry have elapsed.   That period is allowed within which any party feeling aggrieved may apply to the court for suspension of the order; and if such application is made, a speedy hearing must be given (§ 16).

Up to the time when these suits were begun no action of any kind had been taken in relation to matters dealt with by the Act of February 17, 1919, either by the Commission, by any other board or official of the State, by any corporation, or by any other person who could ever be affected by any provision of the statute.   And no action could have been taken; for the act was then not yet in effect.   How then can it be said that, in any legal sense, the Pennsylvania and Ohio consumers were in present danger of irreparable injury?   Plaintiffs' fears were at best premature.   This Court held in *Oregon* v. *Hitchcock,* 202 U. S. 60, 70, that it would not, even at the instance of a State, take upon itself the decision of questions committed to another department of our Government and thus anticipate the action of the federal executive.   The reasons are equally strong against our interfering, in advance of decision, with the executive of a State in a matter committed to its determination.   If these were private suits relief would necessarily be denied.   Compare *First National Bank of Albuquerque* v. *Albright,* 208 U. S. 548; *South Carolina* v. *Georgia,* 93 U. S. 4, 14.   As the suit is that of one State against another, even greater caution should be exercised by this Court before assuming to act. *Missouri* v. *Illinois,* 200 U. S. 496, 520, 521; *Kansas* v. *Colorado,* 206 U. S. 46, 117; *New York* v. *New Jersey,*

256 U. S. 296, 309. The objection here is not, as in *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 238—that those interested should be left to an action at law for redress of any injuries which may be suffered. It is that the " judicial stage " of the controversy had not been reached when these suits were begun; and, indeed, has not been since. See *Prentis* v. *Atlantic Coast Line Co.,* 211 U. S. 210, 228; *Bacon* v. *Rutland R. R. Co.,* 232 U. S. 134, 137.

*Second.* There is a fatal lack of necessary parties. It is only by failure of the twelve exporting companies to continue the exportation of gas that the plaintiffs, and other consumers or the distributing companies in Pennsylvania or Ohio, can be injured. Primarily at least, it is the rights of these twelve corporations, if of anyone, which would be invaded by enforcing the statute; and rights of consumers and of distributing corporations of Pennsylvania and of Ohio are derivative merely. Whether the West Virginia corporations may furnish gas to the plaintiff States, and whether those corporations may be regulated as the statute attempts, are at most controversies between West Virginia and those corporations. They have not submitted their rights to adjudication in these suits. It is intimated that these corporations wish to have the act declared void. But we may not assume that such is their wish. Conceivably a decision holding the act valid might benefit them; since it might relieve them from improvident contracts with distributing companies in Pennsylvania and Ohio. Or it may be that some of the twelve corporations would be benefited and others injured by any decision made of the question presented. Unless the twelve corporations are legally represented either by the plaintiff or the defendant, they would not be bound by a decree in either of these suits. *New Orleans Water Works Co.* v. *New Orleans,* 164 U. S. 471, 480. That neither plaintiff nor defendant legally

represents them is clear.[7]   And since they would not be
bound, this Court should not entertain a suit to decide the
question presented.   For, as was held in *California* v.
*Southern Pacific Co.,* 157 U. S. 229, and *Minnesota* v.
*Northern Securities Co.,* 184 U. S. 199, 246, it does not
comport with the gravity and finality which should char-
acterize an adjudication in the exercise of the original
jurisdiction of this Court to proceed, at the instance of a
State, in the absence of parties whose rights would be
actually passed upon and be in effect determined, even
though they might not be technically bound in sub-
sequent litigation in this, or some other tribunal.   Com-
pare *Texas* v. *Interstate Commerce Commission,* 258
U. S. 158.

The remaining fifty-five West Virginia gas corporations
which do not export any gas are also vitally interested in
the question submitted.   So far as their interest is the
general one *qua* consumer, it might be represented by
the Public Service Commission; and to that end the
Commission (not the State) should, perhaps, have been
made party defendant.   But many of these gas corpora-
tions appear to have specific interests which a decision
might affect directly.   They have contracts with the ex-
porting companies for their supply of gas; and the obliga-
tions under these contracts would be different if the act
is held valid than if it were held to be void.   A decision
to the effect that the prohibition of exports declared in
the act is void might seriously impair their contract
rights.

---

[7] " It is not sufficient to say that the Attorney General, or the Gov-
ernor, or even the Legislature of the State, can be conclusively deemed
to represent the public interests in such a controversy as that pre-
sented by the bill.   Even a State, when it voluntarily becomes a com-
plainant in a court of equity, cannot claim to represent both sides
of the controversy." *Minnesota* v. *Northern Securities Co.,* 184 U. S.
199, 246.

Moreover, § 8 of the act provides:

" That the sections, provisions and clauses of this act shall be deemed separable each from the other, and also in respect to the persons, firms, corporations and consumers mentioned therein or affected thereby, and if any separable part of this act be, or be held to be unconstitutional or for any reason invalid or unenforceable, the remaining parts thereof shall be and remain in full force and effect."

Surely the statute may be valid as to some exporting companies; for the action in exporting may be *ultra vires.* Or certain West Virginia distributing companies may have acquired preferential rights to the supply of gas. How can the Court determine, in view of this provision, that the act is void, *in toto,* when it has not before it the parties to be affected thereby and the facts which only they as litigants would be able to present? Therefore, even if it appeared that rights of the plaintiffs—or of those whom they legally represent—were in present danger of irreparable injury resulting from wrongful acts of defendant, these suits should not be maintained.

*Third.* But if all other obstacles could be overcome, this Court, sitting as a court of equity, should dismiss the bills, because it would be unable to grant the only relief appropriate. This Court, sitting in equity, clearly should not lend its aid to enable West Virginia public service corporations to discriminate against West Virginia consumers in the interest of Ohio and Pennsylvania consumers. Therefore, an appropriate decree should be framed so as to require each of the West Virginia corporations to treat West Virginia customers at least as well as it does those outside of the State and the decree should not leave any West Virginia public service corporation free to export gas in disregard of the duty not to discriminate against the public in that State. But

natural gas is produced also in Pennsylvania and Ohio; and the local production furnishes a large part of the supplies consumed in those States.[8] Furthermore, West Virginia gas is exported also to Maryland, Indiana and Kentucky; and in two of those States natural gas is produced in quantity.[9] Clearly the Court should, in no event, go further than to compel West Virginia to share its production equitably with other States now dependent upon it for a part of their gas supply. But in order to determine what is equitable, (that is, what part of the West Virginia production that State might require its public service corporations to retain and what part they should be free to export to other States) it would obviously be necessary to marshal the resources and the demands, or needs, of the six States, and to consider, in respect to each, both the conduct of the business therein and the circumstances attending its development. The factors necessary to be considered in determining what division of the West Virginia production would be fair, the conditions under which the determination would have to be made, and the character of the questions to be decided are such that this Court would be obliged to refuse to undertake the task. For this reason, the bills should be dismissed, even if it were held both that rights legally represented by plaintiffs were in present danger of irreparable injury by wrongful acts of defendant and that there was not a fatal lack of necessary parties. To

---

[8] In 1920 the production in Pennsylvania was 125,787,000 M cubic feet, and the consumption 161,397,000 M. In 1920 Ohio production was 58,938,000 M cubic feet and the consumption 136,872,000 M. U. S. Geological Survey, " Natural Gas 1919–1921," p. 345, published May 22, 1923.

[9] The 1920 production in Kentucky was 3,345,000 M cubic feet; the consumption 15,297,000 M. The Indiana production 1,779,000 M; the consumption 4,435,000 M. The Maryland production is negligible. U. S. Geological Survey Bulletin, " Natural Gas in 1919–1921," *supra*, p. 345.

do justice as between the several States the following enquiries would be essential:

(a) The potential as well as the actual production in each State would have to be ascertained. The actual production during earlier years, and approximately the current production, could be ascertained from data which are regularly collected by the United States Geological Survey and by the public utility commissions of the several States. But to ascertain the potential production, searching enquiry would have to be made into the methods of production pursued; and, among other things, to what extent recent production has been secured by forcing the wells; what the likelihood is that production lessened by forcing wells will be restored by allowing periods of rest; and to what extent recent reduced outputs may have been attributable to failure to sink enough wells or to open additional territory.[10]  It would be necessary to enquire also into the extent and character of the existing gas reserves, wherever situated and by whomsoever owned. In ascertaining the extent of the gas territory not yet developed, it would be necessary to enquire to what extent the reserve is controlled by, or is otherwise available to, the several public service corporations of the several States; the cost of developing particular fields and of marketing the supply therefrom; what the relation of such undeveloped territory is to that then being worked and to that already exhausted; and to what extent and how rapidly the development of new areas and new sources of supply should properly proceed.

(b) The demand, actual and potential, in each State would have to be determined. In determining the demand, the Court could not confine its enquiry to ascer-

---

[10] Some idea may be formed of the scope of this enquiry by examining the data concerning the natural gas operations collected by the United States Geological Survey.

taining the amount then used or called for. The rates charged in the several communities must also be considered. For upon these, as well as upon the relative cost of other kinds of fuel, would depend in large part the extent of the demand; particularly by the industries. The character of the use and the circumstances under which it had been developed would, likewise, be important factors in deciding what distribution would be equitable. Among other things, it would be necessary to determine to what extent there was, as in Ohio, a high percentage of waste; and what investment had been made in distributing mains and in customers' appliances and when and under what circumstances these investments had been made. For, while a long established local distributing company might reasonably be required to restrict its business to existing customers and even to the existing needs of such, a like restriction would be a great hardship, if applied to new companies which had not yet brought their business to a paying basis.

(c) No determination concerning production and none concerning demand could afford a stable basis for future action; for no factor entering into the determination would be constant. Investigations into supply and demand would have to be pursued continuously; and recurrent decisions as to distribution would be required. Thus, the estimate of the undeveloped gas territory must be ever changing; for new discovery may open territory theretofore unknown; and the sinking of test wells may establish the fact that territory previously deemed valuable will be wholly unproductive. In no other field of public service regulation is the controlling body confronted with factors so baffling as in the natural gas industry; and in none is continuous supervision and control required in so high a degree.

(d) The decisions to be made would be of the character which calls for the informed judgment of a board of

experts. The tribunal would have to determine, among other things, whether inadequate service was due in the several States to inadequate supply or to improvident use by some consumers; whether to overcome inadequacy of supply new territory should be developed or more wells be sunk in old territory; whether, in view of prospective needs of the several communities, it would not be better that the reserves should be husbanded and that the uses to which gas may be put be curtailed. It would, thus, be called upon to review—and perhaps to control—the business judgment of those managing the companies. Pro rata distribution among all users of the gas from time to time available would obviously not result in equitable distribution. For domestic users, and also many industrial ones, would, if their gas supply were uncertain, find it necessary to assure themselves of an adequate supply for heating, cooking and power, of either oil or some other kind of fuel; and the expense of producing the necessary alternative appliances would be large. The tribunal would have to decide, also, many other serious questions of the character usually committed for determination to public utility commissions, and the difficulties involved in these decisions would be much enhanced by differences in the laws, rules and practices of the several States regarding the duties of natural gas companies to furnish adequate service.[11]

---

[11] For instance: If it should appear that the potential supply in Pennsylvania is ample for all present needs, but that its concerns prefer to husband their resources for the remoter future, would it be unjust discrimination on the part of the West Virginia companies to deny to their customers within the State an adequate supply while supplying to Pennsylvania distributing companies an amount of gas which these might have produced from reserves within Pennsylvania? Or if Kentucky had ample supplies and undeveloped fields, but sought gas from West Virginia because the Kentucky companies did not have the funds, or the inclination, to make, at the time, a large investment required to secure a supply within that State, would, under those

Clearly, this Court could not undertake such determinations. To make equitable distribution would be a task of such complexity and difficulty that even an interstate public service commission with broad powers, perfected administrative machinery, ample resources, practical experience and no other duties, might fail to perform it satisfactorily. As this Court would be powerless to frame a decree and provide machinery by means of which such equitable distribution of the available supply could be effected, it should, according to settled practice, refuse to entertain the suits. Compare *Marble Co.* v. *Ripley*, 10 Wall. 339, 358; *Texas & Pacific Ry. Co.* v. *Marshall*, 136 U. S. 393, 406; *Giles* v. *Harris*, 189 U. S. 475, 487, 488.

---

circumstances, West Virginia companies be justified in supplying the Kentucky demand while leaving that of its West Virginia customers unsatisfied? Should distributing companies in Pennsylvania, Ohio, Kentucky and Indiana be permitted to extend their mains or add new customers after West Virginia had recognized the insufficiency of the supply to satisfy the needs of consumers within the State? And what shall be deemed the existing demand of a State? Is existing demand to be limited to customers already connected? And does it mean the amount theretofore taken by such customers or that which they may wish to take through existing appliances?