795 F.2d 195
 122 L.R.R.M. (BNA) 3209, 254 U.S.App.D.C. 150
 NORTHWEST AIRLINES, INC., Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent,
Larry W. Morrison, Air Line Pilots Association,
International, Intervenors.
NORTHWEST AIRLINES, INC., Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent.
 Nos. 84-1510, 85-1692.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 18, 1985.
Decided July 18, 1986.
As Amended July 23, 1986.
 
 Petitions for Review of Orders of the Federal Aviation administration.
 William R. Stein, with whom Philip A. Lacovara and Patricia A. Dean, Washington, D.C., were on brief, for petitioner in Nos. 84-1510 and 85-1692.
 Darlene M. Freeman, Atty., F.A.A., Washington, D.C., for respondent in Nos. 84-1510 and 85-1692.
 Gary Green and Eugene B. Granof, Washington, D.C., were on brief, for intervenors, Air Line Pilots Ass'n, Intern., et al. in No. 84-1510.
 Before MIKVA and BORK, Circuit Judges, and SWYGERT*, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge BORK.
 BORK, Circuit Judge:
 
 
 1
 Petitioner Northwest Airlines, Inc. seeks review of a series of decisions by the Federal Aviation Administration authorizing one of Northwest's former pilots, Larry W. Morrison, to fly commercial passenger airplanes. Morrison's pilot certificate had been temporarily suspended after he was found flying while intoxicated, an incident which led also to his discharge from Northwest. Morrison is no longer in its employ, but Northwest nevertheless seeks to have his authorization to fly permanently revoked.
 
 
 2
 Although Northwest raises serious questions concerning the FAA's policies with respect to alcoholic pilots and those who fly while intoxicated, its petition fails to raise a justiciable "case or controversy" within the meaning of article III of the Constitution. Northwest has advanced three separate theories in support of the claim that it possesses standing to raise this challenge. First, Northwest asserts that the certification of an unfit pilot renders the skies less safe and endangers the company's passengers and crew. Second, Northwest argues that a lenient policy of recertification makes it more difficult for an airline with stricter standards like itself to deter violations among its employees. The third set of interests alleged revolve around the possibility that Northwest may in the future be forced to rehire Morrison. We hold that the first two asserted injuries are insufficient predicates for standing in this case, and that the third does not yet present us with a ripe controversy.I.
 
 
 3
 In order to fly within the United States, a pilot must be in possession of both a pilot certificate, 14 C.F.R. Sec. 61.3(a) (1985), and a medical certificate, 14 C.F.R. Sec. 61.3(c) (1985). Pilot certificates are awarded by the FAA. To be eligible to receive the pilot certificate necessary to fly a commercial airplane, an applicant must meet several requirements, including passing a written examination and a flight test. 14 C.F.R. Sec. 61.123 (1985). Possession by the applicant of a valid medical certificate is a prerequisite to the issuance of a pilot certificate. 14 C.F.R. Sec. 61.123(c) (1985).
 
 
 4
 Medical certificates are issued by the Federal Air Surgeon, the chief medical officer of the FAA. The standards for eligibility are described in 14 C.F.R. Part 67 (1985). In order to receive an unrestricted medical certificate, an applicant must, inter alia, have "no established medical history or clinical diagnosis" of alcoholism, "unless there is established clinical evidence, satisfactory to the Federal Air Surgeon, of recovery, including sustained total abstinence from alcohol for not less than the preceding 2 years." 14 C.F.R. Sec. 67.13(d)(1)(i)(c) (1985). However, a pilot who has a medical history or clinical diagnosis of alcoholism and who has not abstained completely for two years is not necessarily grounded. The Federal Air Surgeon has the discretion to award such an applicant a "special issuance." A "special issuance" is a valid medical certificate to which the Federal Air Surgeon may attach a variety of conditions, such as testing and monitoring. He may restrict its use by defining its duration and by imposing those limits on its operation that he deems necessary for safety. A special issuance may be given to a pilot who fails to qualify for an unstricted medical certificate because of alcohol-related problems if the Federal Air Surgeon determines that the certificate can be issued "without endangering air commerce." 14 C.F.R. Sec. 67.19(a) (1985).
 
 
 5
 On the morning of August 1, 1982, Northwest Flight 81 left Las Vegas bound for San Francisco, Seattle, Spokane and Minneapolis, with passengers aboard. The crew included Morrison, who was serving as co-pilot. Morrison had consumed substantial amounts of alcohol in the two days prior to departure. He had had his most recent drink four hours before the plane departed.
 
 
 6
 On the morning of takeoff, Morrison stated that he was ill and asked to be relieved. When he was told that the flight would then have to be cancelled, he agreed to fly provided he be replaced when the plane landed in Seattle, its second stop. This request apparently made Northwest's Manager of Flight Operations suspicious, for upon being informed of this (after the flight had taken off), he ordered that Morrison be removed from the plane at its first stop, San Francisco, and be given a blood test. The plane touched down in San Francisco approximately one hour after its departure from Las Vegas. After some discussion with a union representative, Morrison submitted to the blood test. That test, which was administered nearly three hours after takeoff, revealed a blood alcohol level of 0.13%, which is sufficient in California to establish a presumption of legal intoxication.
 
 
 7
 Northwest's own company regulations forbid crew members from drinking alcoholic beverages twenty-four hours prior to departure. For violating that rule, Morrison was discharged by letter on August 6, 1982, effective August 1, 1982. One day after receiving the letter of discharge, Morrison began four weeks of alcoholism treatment at Valley General Hospital in Monroe, Washington. He attended weekly counseling sessions thereafter.
 
 
 8
 At the time of his discharge, Morrison remained in possession of valid pilot and medical certificates and was therefore still authorized to fly. On January 20, 1983, the FAA revoked Morrison's pilot certificate, informing Morrison that his conduct immediately prior to and during Northwest Flight 81 was in violation of three separate federal aviation regulations: 14 C.F.R. Sec. 91.11(a)(1) (1985) (prohibiting consumption of alcohol within eight hours of flight); 14 C.F.R. Sec. 91.11(a)(2) (1985) (prohibiting acting as a crew member while under the influence of alcohol); and 14 C.F.R. Sec. 61.53 (1985) (prohibiting acting as a crew member while suffering from a known medical deficiency). Emergency Order of Revocation, Joint Appendix ("J.A.") at 8-9. Morrison appealed this revocation order to the National Transportation Safety Board. As a result of settlement negotiations, however, the FAA withdrew its revocation order and substituted in its place a suspension order, which invalidated Morrison's pilot certificate for a minimum of one year from the date of the violation, "to continue thereafter until [he] requalif[ies] medically." Emergency Order of Suspension, J.A. at 5-6. Morrison, in turn, waived his rights to appeal that order.
 
 
 9
 On September 2, 1983, Morrison applied to the FAA for a special issuance. His application was sponsored by Dr. Robert Riordan, whom Morrison had selected from among the several Aviation Medical Examiners who are accepted by the FAA as medical sponsors of alcoholic pilots. Morrison was examined by several doctors, whose eventually favorable reports were submitted to Dr. Riordan, and Dr. Riordan then recommended to the FAA that Morrison be medically recertified.
 
 
 10
 On January 10, 1984, the Federal Air Surgeon found Morrison eligible for the special issuance of a medical certificate, subject to several conditions. Most significantly, Morrison would have to abstain completely from alcohol and submit regular reports to Dr. Riordan from representatives of both the company and the Air Line Pilots Association attesting to his abstinence from alcohol, as well as progress reports from his psychiatrist and from a counselor at a Community Alcohol Center. On the basis of the special issuance, the FAA reissued Morrison's pilot certificate, and he was again authorized to fly.
 
 
 11
 Northwest refused to provide the monitoring reports on which the special issuance was conditioned. It has a policy of refusing to participate in such monitoring. Despite the absence of these reports, the FAA, on May 9, 1984, approved the continued issuance of a medical certificate valid until August 31, 1984. On September 28, 1984, the FAA extended certification through February 28, 1985, telling Morrison that "[s]ince you are unable to provide the company reports, we are deleting that requirement from your special issuance certification." J.A. at 12. On November 14, 1984, however, the FAA reversed itself and required that Morrison return his medical certificate, on the ground that he was unable to supply the necessary monitoring reports from Northwest. The FAA recommended to Morrison that he
 
 
 12
 continue to provide Dr. Riordan with the remaining reports that are required by your special issuance letter. At such time as you obtain employment with another airline or company and will be able to provide company reports, or at the time your 24-month monitoring period is completed, we will reconsider your medical certification.
 
 
 13
 Letter from Audie W. Davis to Larry Morrison (Nov. 14, 1984), J.A. at 11.
 
 
 14
 While the temporary special issuances were being approved and extended, Northwest had been seeking to have the Federal Air Surgeon's determination that Morrison was fit to fly revoked. On March 16, 1984, two months after the granting of the first special issuance, Northwest submitted a request for reconsideration and revocation to the Federal Air Surgeon. The company explained:
 
 
 15
 Mr. Morrison is contesting his discharge by Northwest Airlines and accordingly, we have had a direct pecuniary interest in the status of any Medical Certificate issued to him since his discharge on August 1, 1982.
 
 
 16
 Letter from Michael I. Fahey, Director of Labor Relations, Northwest Airlines, Inc. to H.L. Reighard, Federal Air Surgeon, and J. Lynn Helms, Administrator, Federal Aviation Administration (Mar. 16, 1984), J.A. at 88-89. Northwest argued that issuing the certificate was inconsistent with federal law requiring that safety be the FAA's paramount concern, that a special issuance should not be given to any alcoholic who has not abstained totally from the use of alcohol for two years, and that because Morrison was not only an alcoholic but one who had broken the rules and actually flown while intoxicated, his certification ought to be permanently revoked. Northwest's request was denied by letter. Letter from H.L. Reighard to Michael I. Fahey (Apr. 20, 1984), J.A. at 85-86. Northwest then submitted a petition for reconsideration to the Administrator in which it elaborated on its arguments. Petition for Reconsideration, J.A. at 21. This too was denied. Letter from Donald D. Engen, Administrator, to Michael I. Fahey (Aug. 20, 1984), J.A. at 14-16. This petition for review followed, challenging (1) the January 10, 1984 order of the Federal Air Surgeon authorizing Morrison to receive a special issuance, and all medical certificates issued pursuant to that authorization, (2) the order of March 6, 1984, reissuing Morrison's pilot certificate, (3) the Federal Air Surgeon's denial on April 9, 1984, of Northwest's request for reconsideration of the January 10 order, and (4) the Administrator's denial on August 20, 1984, of Northwest's request for reconsideration of the January 10 order.
 
 
 17
 On September 13, 1985, the FAA issued an order lifting some of the monitoring requirements from Morrison's special issuance medical certificate. Northwest filed a petition for review from this order, and that petition was consolidated with the first.
 
 
 18
 Northwest challenges Morrison's recertification on four distinct grounds. First, Northwest argues that failure to permanently decertify a pilot who has flown while intoxicated violates the FAA's statutory mandate to promote safety. Second, it claims that granting special issuances to alcoholic pilots with less than two years of abstinence (whether or not they have ever flown while intoxicated) violates that same statutory mandate, as well as the FAA's own regulations. Third, Northwest challenges the practice of delegating to private parties--company and union representatives--the task of monitoring the abstinence of the recertified alcoholics. Finally, Northwest seeks to demonstrate that, even assuming the validity of the underlying alcoholism policies, the application of those policies in Morrison's case was arbitrary and capricious because the standard of scrutiny was improper and the record evidence was contradictory and ambiguous.
 
 II.
 
 19
 The source of Morrison's authorization to fly is no longer a special issuance. As we have explained, the special issuance most recently in effect required monitoring that Morrison was unable to supply, and he was therefore required to return his medical certificate to the FAA. In any event, special issuances are of temporary duration, and the likelihood that any particular special issuance will outlast the wait for oral argument in this court is small.
 
 
 20
 The expiration of the special issuances does not, in and of itself, render this case moot. As petitioner explains:
 
 
 21
 Northwest is not contesting simply the "special issuance" of a medical certificate. It is challenging the FAA's basic determination--reflected in the Federal Air Surgeon's January 10, 1984, letter authorizing Morrison's recertification--that Morrison is fit to fly, despite his serious misconduct and the risk that he will engage in similar misconduct in the future. All the other orders before this Court ... were expressly premised on the Air Surgeon's January 10 finding.
 
 
 22
 Reply Brief of Petitioner Northwest Airlines, Inc. at 16. Two of Northwest's four legal claims--the challenge to the award of special issuances to alcoholics with less than two years of abstinence, and the challenge to the monitoring procedures on which this special issuance was conditioned--relate solely to the special issuance process. The other two claims--that Morrison ought to be permanently grounded and that the record evidence in support of the January 10 order was insufficient--are broader in scope, for, if meritorious, they call into question as well any unrestricted medical certificate that might be forthcoming.[1] We need not decide whether the two claims that relate solely to the special issuance are "capable of repetition, yet evading review," Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), and therefore not moot, because Northwest has not demonstrated that it has standing to challenge "the FAA's basic determination ... that Morrison is fit to fly."
 
 
 23
 In order to demonstrate that he has standing to pursue a legal claim, a party must show "at an irreducible minimum," Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that this injury "fairly can be traced to the challenged action" and is "likely to be redressed by a favorable decision." Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.22d 450 (1976). Northwest suggests that as an air carrier it has a particularized interest in the safety of its flights, and that this interest is jeopardized when pilots who should not be flying are certified. It does not matter, under this theory of standing, that Morrison is not currently flying Northwest planes. Nor is Morrison's status as a former Northwest employee at all relevant. The claim is simply that allowing unfit pilots in the skies endangers all others who fly and confers upon them standing to challenge any specific certification decision. If this interest were sufficient, it could not be limited to airline companies; any individual who flies, or who intends to, could claim that he has the interest necessary to oppose in court the licensing of any particular pilot. We think it clear, however, that it is not sufficient, for it fails to satisfy the constitutional requirement that there be injury in fact.
 
 
 24
 The injury requirement will not be satisfied simply because a chain of events can be hypothesized in which the action challenged eventually leads to actual injury. The injury asserted must be a "distinct and palpable" one, Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and not merely "conjectural," Babbitt v. United Farm Workers National Union, 442 U.S. 289, 304, 99 S.Ct. 2301, 2311, 60 L.Ed.2d 895 (1979). Here, no representation has been made to us that Morrison has been hired by any other airline. Even if he is employed elsewhere, the possibility that he will fly in areas in which Northwest maintains routes and actually cause injury to Northwest's passengers and crew is too remote and speculative to constitute injury. Where there is no current injury, and a party relies wholly on the threat of future injury, the fact that the party (and the court) can "imagine circumstances in which [the party] could be affected by the agency's action" is not enough. United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 688-89, 93 S.Ct. 2405, 2416-17, 37 L. E 2d 254 (1973) (emphasis added). A plaintiff or petitioner "must demonstrate a realistic danger of sustaining a direct injury .... '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." Babbitt, 442 U.S. at 298, 99 S.Ct. at 2308 (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)) (other citations omitted) (emphasis added). This principle was most recently reaffirmed in Diamond v. Charles, --- U.S. ----, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), in which the Supreme Court rejected a claim of standing founded on a pediatrician's expectation that children who would otherwise have been aborted would become his paying customers if a Pennsylvania statute that might have discouraged abortion were upheld. What was dispositive was not that the series of events posited was theoretically impossible, or that the ultimate injury--loss of business--was itself insufficient, but rather that the likelihood of any injury actually being inflicted was too remote to warrant the invocation of judicial power.
 
 
 25
 Northwest does not suggest that an air crash involving Morrison is even likely, much less "certainly impending," Babbitt, 442 U.S. at 298, 99 S.Ct. at 2308, and the marginally increased possibility that such an event will happen does not constitute injury in fact. The case is similar in this respect to United Presbyterian Church in the U.S.A. v. Reagan, 738 F.2d 1375 (D.C.Cir.1984), in which we upheld the dismissal for lack of standing of an action brought by several religious organizations, political organizations, and private citizens challenging an Executive Order relating to intelligence activities within the United States. We found that plaintiffs' mere fear that intelligence activities made possible by this order would be focused upon them was insufficient, for they had not "adequately averred that any specific action is threatened or even contemplated against them." Id. at 1380. The order in that case did not "direct intelligence-gathering activities against all persons who could conceivably come within its scope, but merely authorize[d] them." Id. (emphasis in original). See City of Los Angeles v. Lyons, 461 U.S. 95, 98, 103 S.Ct. 1660, 1663, 75 L.Ed.2d 675 (1983) (plaintiffs' fear that "any contact he has with Los Angeles Police Officers" may result in use of chokehold against him insufficient for standing to seek injunction against use of chokehold); accord Ashcroft v. Mattis, 431 U.S. 171, 172 n. 2, 97 S.Ct. 1739, 1743 n. 2, 52 L.Ed.2d 219 (1977); O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).
 
 
 26
 Perhaps recognizing the inadequacy of this injury for standing purposes, Northwest points out that the policy that supported the recertification of Morrison has justified the recertification of many other alcoholic pilots as well, and will continue to do so. The threatened injury, Northwest argues, comes not from Morrison alone, but from all pilots with a similar background and condition. If this court invalidates the recertification of Larry Morrison on the ground that no pilot who flies while intoxicated may ever be allowed to fly again, those other pilots will be grounded as well.
 
 
 27
 In expanding the alleged injury from the danger posed by Morrison to the danger posed by these (unidentified) other pilots, Northwest has confused the scope of its injury with the scope of the requested remedy. The fact that Northwest has framed its argument in such a way that success would have an impact beyond the invalidation of Morrison's medical certificate is irrelevant. Morrison's certification is the only agency action before us, and therefore all that can be challenged in this litigation is the determination that Morrison is fit to fly. A petitioner with standing to challenge that determination is free to raise legal arguments in support of that challenge that have implications beyond the Morrison proceeding. Those arguments, however, and the consequences that would flow were we to adopt them, cannot be used as an end run around the requirement that the injury alleged be fairly traceable to the government action challenged. Any injury that might potentially result from the danger posed by other similarly situated pilots is not traceable to the decision to certify Morrison, and thus the requirement of causation cannot be met with respect to such an injury. Given the posture of this case--a challenge to a specific recertification--the injury cannot be thus generalized.
 
 
 28
 We conclude, therefore, that any threat to the safety of Northwest's flights from the recertification of Larry Morrison alone is far too speculative and conjectural to provide a basis for standing. We turn next to Northwest's second assertion of injury. Northwest maintains somewhat stricter standards than does the FAA with respect to alcoholism. Thus, for example, Northwest requires that its crews abstain from alcohol for a full twenty-four hours prior to departure, while the analogous FAA regulation requires only eight hours of abstinence. The FAA, as this case demonstrates, will consider recertifying a pilot who violates its alcoholism rules, while at Northwest the same behavior may be grounds for permanent discharge. Northwest is free to institute more demanding requirements than the FAA. It maintains, however, that what it characterizes as an overly lenient FAA policy makes it more difficult for Northwest to enforce its own higher standards among its employees, for they are less deterred than they would be were the FAA stricter. Northwest employees, knowing that they may well be able to get recertified and seek employment at other airlines, are less intimidated by the threat of discharge from Northwest. Northwest asserts that it is therefore more likely that they will drink on the job.
 
 
 29
 Northwest has produced no support for this allegation. It has identified no employees who, upon learning that Morrison was recertified, consumed alcoholic beverages they would not otherwise have drunk. Such specificity is not required in every case. But where, as here, there is nothing but the bare intuition of a causal nexus, and that nexus is of the sort that has consistently been recognized by the Supreme Court as inadequate to establish standing, the simple assertion that causation exists will not do.
 
 
 30
 The causal nexus proffered here is extraordinarily attenuated: petitioner complains of the failure by a government agency to take sufficiently harsh action against a second party in order to deter an unknown third party from engaging in conduct that harms the petitioner. Similar nexuses were rejected as inadequate in Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and Linda R.S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).
 
 
 31
 In Allen v. Wright, parents of black children attending public schools in districts undergoing desegregation claimed that the Internal Revenue Service had not adopted sufficient standards to fulfill its obligation to deny tax-exempt status to racially discriminatory schools. They argued that this deficiency helped foster and encourage such schools, thus denying the members of the plaintiff class their right to an integrated educational system. The Court determined that these plaintiffs lacked standing in part because it was "entirely speculative" whether withdrawal of a tax exemption would lead a school to change its policies. 468 U.S. at 758, 104 S.Ct. at 3328-29. In Simon, the Court dismissed a complaint that challenged a revenue ruling on the ground that by extending favorable tax treatment to hospitals that did not serve indigent patients to the full extent of the hospitals' ability, the IRS was encouraging such hospitals to deny services to indigents. The Court found the chain of causation "purely speculative," because there was no concrete indication that the denial of services was the product of favorable tax treatment. 426 U.S. at 42-43, 96 S.Ct. at 1926-27. For similar reasons, the Court held that the plaintiff in Linda R.S. lacked standing to challenge the failure of the local district attorney to prosecute the father of her child for failure to provide child support. "The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative. Certainly the 'direct' relationship between the alleged injury and the claim sought to be adjudicated, which previous decisions of this Court suggest is a prerequisite of standing, is absent in this case." 410 U.S. at 618, 93 S.Ct. at 1149.[2]
 
 
 32
 A court may act only to redress injury "that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Simon, 426 U.S. at 41-42, 96 S.Ct. at 1926. Accord Warth v. Seldin, 422 U.S. at 505, 95 S.Ct. at 2208 (petitioners' desire to live in town with alleged exclusionary practices "always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing," and in the absence of evidence that specific projects would otherwise be built at prices they could afford, plaintiffs lack standing to challenge exclusionary practices); Mideast Systems and China Civil Construction Saipan Joint Venture, Inc. v. Hodel, 792 F.2d 1172, 1177 (D.C.Cir.1986) ("the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied"). When the impact of the government action challenged is that indirect, it will generally be very difficult to establish the causative relationship necessary to demonstrate article III standing.
 
 
 33
 Missing from Northwest's theory of inadequate deterrence are allegations demonstrating any of the three elements necessary to make out a "case or controversy." Northwest has not identified for us any alcoholic crew members currently in its employ; if they exist, we do not know that their drinking is traceable to actions of the FAA; and, consequently, there can be no plausible allegation that an order eliminating the speculative cause of this hypothetical injury would redress anything at all. When we once again take note of the fact that this injury is said to flow from the recertification of an individual pilot, it becomes clear that the asserted injury and chain of causation are "remote at best," Mideast Systems, 792 F.2d at 1177, and far from a sufficient basis for standing in this case.
 
 
 34
 We come, therefore, to Northwest's final effort at establishing a stake in this litigation sufficiently real and concrete to enable the company to pursue its legal claims. Northwest points out that it may in the future become obligated to rehire Morrison. Because Northwest is under no such obligation at present, however, we hold that its petition is not ripe for review.
 
 
 35
 Morrison challenged his discharge from Northwest before the System Board of Adjustment, an arbitration panel established pursuant to the Railway Labor Act, 45 U.S.C. Sec. 181 et seq. (1982). The arbitration panel determined that since alcoholism was an illness, it could constitute a legitimate defense to a charge of violating the twenty-four hour rule when that violation was the "unavoidable consequence" of the illness. In re: Arbitration between Northwest Airlines, Inc. and Air Line Pilots Association at 39, Addendum to Brief for the Respondent. The Board took note of the granting of the special issuance and the treatment that Morrison had undergone, and concluded that Morrison "should be given an opportunity to demonstrate ... that he can meet the Company's standards for flying." Id. Therefore, the Board held, Morrison's discharge was without just cause, and he was ordered reinstated at such time as the Federal Air Surgeon certifies that he meets the requisite medical standards and can perform his duties without monitoring.
 
 
 36
 Since Morrison was still subject to the monitoring requirements at the time the arbitration panel rendered its decision, the award had no immediate effect. Before the condition precedent was fulfilled, Northwest challenged the award successfully in federal district court. On November 27, 1985, Judge Joyce Green of the United States District Court for the District of Columbia granted summary judgment in favor of Northwest, and reversed the decision of the Board. Northwest Airlines, Inc. v. Air Line Pilots Association, International, 633 F.Supp. 779 (D.D.C.1985). Judge Green considered the two strong competing interests at stake--the federal policy of encouraging safe air travel and the federal policy of resolving labor differences through arbitration--and concluded that on the facts of the particular case, the policy favoring air safety took precedence and required that the arbitration decision be set aside. The Air Line Pilots Association is appealing that decision to this court, and oral argument has not yet been scheduled.
 
 
 37
 Since Northwest is under no present obligation to rehire Morrison, and may never be, a petition for review premised on that interest does not yet present a ripe controversy.[3] If Northwest were forced to hire a pilot it considered unfit, and if that imposition were fairly traceable to the FAA recertification decisions, Northwest would have standing to challenge those decisions and the reasoning that underlies them. Since that injury, while concrete enough to establish injury in fact, does not yet exist, Northwest cannot pursue its claims at this time. If Northwest is in the future required to rehire Morrison, the sufficiency of the causal nexus between that action and the FAA decisions challenged here will be determined by the legal basis of whatever obligation is imposed. We cannot prejudge that now.
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 We conclude, therefore, that Northwest has not yet alleged any injury that is at once both sufficiently concrete and fairly traceable to the FAA orders it seeks to challenge. Accordingly, its petitions for review are
 
 
 41
 Dismissed.
 
 
 
 *
 Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1982)
 
 
 [1]
 Petitioners state that it is "just a matter of time" until Morrison is granted an unrestricted medical certificate, Reply Brief at 16-17, and suggested that one would almost certainly be issued in January of 1986. This case was argued in December of 1985. Neither party has informed us whether the unrestricted certificate has in fact been issued. Since the finding that petitioner lacks standing to pursue these claims is not altered by assuming that the unrestricted certificate has been issued, we adopt that assumption for the purposes of this opinion
 
 
 [2]
 This theory of causation may be thought not entirely convincing. As Justice White stated in dissent:
 The Court states that the actual coercive effect of those sanctions on Richard D. or others "can, at best, be termed only speculative." This is a very odd statement. I had always thought our civilization has assumed that the threat of penal sanctions had something more than a "speculative" effect on a person's conduct. This Court has long acted on that assumption in demanding that criminal laws be plainly and explicitly worded so that people will know what they mean and be in a position to conform their conduct to the mandates of law. Certainly Texas does not share the Court's surprisingly novel view. It assumes that criminal sanctions are useful in coercing fathers to fulfill their support obligations to their legitimate children.
 Linda R.S., 410 U.S. at 621, 93 S.Ct. at 1150 (White, J., dissenting). This suggests, perhaps, that cases like Linda R.S., Simon, and Allen v. Wright are not simply the product of the view that theories of deterrence are entirely fanciful, but rather reflect separation-of-powers concerns about the spread of judicial authority. See Allen v. Wright, 468 U.S. at 752, 104 S.Ct. at 3325. Given the complexity and interdependence of our society and governmental policies, it will often be possible to allege with some plausibility that a change in a governmental policy is likely to cause other persons or institutions to modify their behavior in ways beneficial to the plaintiff. If such allegations were routinely accepted as sufficient to confer standing, courts would be thrust into a far larger role of judging governmental policies than is presently the case, or than seems desirable.
 
 
 [3]
 Northwest also informs us that there are other, similar arbitration procedures involving other alcoholic pilots, and suggests that it has standing by virtue of its interest in resolving them in its favor. "Although Judge Green overturned the arbitral decision in this case, that is no guarantee that other pilots and other arbitrators--or other district courts--will respect Judge Green's ruling." Supplemental Brief of Petitioner at 5. Northwest makes here the same error made earlier: confusing the scope of the remedy with the scope of the injury. See supra p. 202. If the fact that the precedential impact of a decision we might issue could conceivably affect other, separate proceedings were sufficient to confer standing upon Northwest, then any individual could challenge in court the holding in any administrative adjudication in which he had not participated and by which he was not affected, as long as the theory underlying its resolution could plausibly be applied to a future proceeding in which he would be participating. The risk that Northwest may lose at other arbitration proceedings is not in the least traceable to the FAA's decision that Morrison is medically qualified to fly